2013 CO 41

Concerning the APPLICATION FOR WA-TER RIGHTS of Applicant Raftopoulos Brothers in Moffat County

Vermillion Ranch Limited Partnership, Opposer–Appellant

v.

Raftopoulos Brothers, Applicant–Appellee

Erin C.H. Light, in her official capacity as Division Engineer, Water Division 6 and The United States of America, Department of Interior, Bureau of Land Management and U.S. Fish and Wild Life Service, Opposers–Appellees

Concerning the Application for Water Rights of Applicant Vermillion Ranch Limited Partnership in Moffat County

Raftopoulos Brothers, Opposer–Appellant

v.

Vermillion Ranch Limited Partnership, Applicant–Appellee

Erin Light, in her official capacity as Division Engineer Water Division 6, pursuant to CAR 1(e), Opposer–Appellee

Supreme Court Case No. 11SA86, Supreme Court Case No. 11SA124

Supreme Court of Colorado, En Banc.

June 24, 2013

Attorneys for Raftopoulos Brothers: Balcomb & Green, P.C., Scott Balcomb, David C. Hallford, Scott A. Grosscup, Glenwood Springs, CO

Attorneys for Vermillion Ranch Limited Partnership: Holsinger Law, LLC, Kent Holsinger, Laura L. Chartrand, Jack Silver, Denver, CO

Justice MÁRQUEZ delivered the Opinion of the Court.

¶ 1 In this opinion,[1] we consider three water rights cases involving Raftopoulos Brothers ("Raftopoulos") and Vermillion Ranch Limited Partnership ("Vermillion"). Raftopoulos and Vermillion both conduct large ranching operations in northwest Colorado. They own neighboring properties and hold decreed water rights on Talamantes Creek, a small tributary located in a dry, remote area of Moffat County. The issues we consider here largely concern Raftopoulos' and Vermillion's competing efforts to develop water rights on Talamantes Creek for eventual industrial and commercial use.

¶ 2 In Case No. 11SA86, we consider the water court's ruling in Case No. 08CW89 concerning Raftopoulos' application for new conditional water rights and for changes of previously decreed absolute and conditional water rights. In that application, Raftopoulos requested, among other things, a change of water rights to add alternate points of diversion for Raftopoulos' absolute direct flow rights in the Rouff Ditch No. 1 and the Yarnell Ditch No. 1 and to change the place of use of those rights to irrigate lands upstream from their historical place of use. Raftopoulos also requested a new conditional water storage right to store water in one or both of two proposed reservoirs. The water court granted Raftopoulos' application.

¶ 3 On appeal, Vermillion does not challenge the water court's ruling granting Raftopoulos' request to add alternate points of diversion for Rouff Ditch No. 1 and the Yarnell Ditch No. 1 and to change the place of use under those alternate points of diversion

to irrigate different lands. Rather, Vermillion challenges the water court's order to the extent that it (1) interpreted the phrase "all other beneficial purposes" in 1974 change decrees concerning those absolute rights to include industrial and commercial purposes, and (2) concluded that those uses had not been abandoned. However, Raftopoulos' application to change the place of use and add alternate points of diversion for these absolute direct flow rights was limited to using the water for irrigation purposes. Because the water court's interpretation of the phrase "all other beneficial uses" in the 1974 decrees was unnecessary to adjudicate Raftopoulos' requested change of water rights, we vacate that portion of the water court's order interpreting the 1974 decrees and concluding that any industrial or commercial uses had not been abandoned.

¶ 4 Vermillion also challenges the water court's order granting Raftopoulos new conditional water storage rights to store up to 1440 A.F. at one or both of two possible reservoir sites. The water court decreed the conditional storage right for multiple uses; however, Vermillion challenges the water court's decree only to the extent that it permits the water to be used for industrial and commercial purposes. Vermillion contends that Raftopoulos failed to meet its burden to show a non-speculative intent to put the water to beneficial use for those purposes, as required by section 37–92–103(3)(a), C.R.S. (2012), and failed to demonstrate that its existing absolute water rights were insufficient to meet those demands. We agree and reverse that portion of the water court's order decreeing Raftopoulos' requested new conditional water storage rights for industrial and commercial purposes.

¶ 5 In Case No. 11SA124, we consider the water court's rulings on two applications filed by Vermillion. In Case No. 08CW54, Vermillion applied for a sexennial finding of reasonable diligence with respect to a previously decreed conditional right to store 1200

---

1. Although the water court held separate trials on Raftopoulos' and Vermillion's applications, it reviewed and considered the evidence presented on all three applications collectively because the cases involved the same parties and the same source of water. We therefore address these cases together in this opinion.

A.F. at the proposed Sparks Reservoir and three alternate proposed reservoir locations. In Case No. 06CW61, Vermillion applied for a new conditional storage right to store an additional 1200 A.F. in the proposed Sparks Reservoir and the three alternate sites for eventual industrial and commercial use. The water court initially denied both applications on grounds that Vermillion failed to satisfy the "can and will" standard of section 37–92–305(9)(b), C.R.S. (2012). However, after Raftopoulos filed a motion for post-trial relief, the water court concluded that it had misapplied the "can and will" standard. It reversed its rulings and entered decrees granting Vermillion a finding of reasonable diligence in Case No. 08CW54, and granting Vermillion' s request for a new conditional water storage right in Case No. 06CW61.

¶ 6 On appeal, Raftopoulos contends that the water court erred in granting Vermillion' s applications because Vermillion failed to meet its burden of establishing, pursuant to section 37–92–305(9)(b), that the reservoirs "can and will" be completed with diligence and in a reasonable time. Raftopoulos argues that the water court applied an incorrect standard that effectively shifted that burden to Raftopoulos, as the opposer, to prove the impossibility of construction.

¶ 7 We conclude that Vermillion failed to demonstrate through evidence at trial that it "can and will" complete the reservoirs as required by section 37–92–305(9)(b). Accordingly, we reverse the water court's order in Case No. 08CW54 concluding that Vermillion has been reasonably diligent in developing its previously decreed conditional water storage right in those reservoirs. For the same reason, we reverse the water court's order granting a new conditional water storage right in Case No. 06CW61.

### I. Background

¶ 8 Talamantes Creek is located in a remote area of Moffat County approximately 100 miles northwest of Craig, Colorado. The Talamantes is a tributary to Vermillion Creek, which is itself a tributary to the Green River. The first adjudication of water rights on Talamantes Creek occurred in the 1890s. Thereafter, a single ranching family owned all the decreed water from Talamantes Creek and all the land in the area served by the water. In the 1950s, the property and water rights were split between two daughters. The upstream parcel was sold in the 1970s to nonfamily owners. Raftopoulos acquired this property and certain associated water rights in 1985. Raftopoulos operates a large sheep and cattle ranching operation in Colorado, Utah, and Wyoming. The downstream parcel is controlled by members of Vermillion Limited Partnership, who are from the original ranching family. Vermillion continues to operate a large cattle ranching business in Colorado and Wyoming and owns the senior water right on Talamantes Creek.

¶ 9 The appeals before us center on the parties' competing applications to develop rights to use water from Talamantes Creek for industrial and commercial purposes.

### II. Case No. 11SA86—Raftopoulos' Application (08CW89)

¶ 10 In Case No. 08CW89, Raftopoulos filed an application requesting new conditional water rights and changes of previously decreed absolute and conditional water rights. Relevant here, Raftopoulos requested a change of its absolute direct flow rights in the Rouff Ditch No. 1 and the Yarnell Ditch No. 1 to add alternate points of diversion and to change the place of use of those rights to irrigate lands upstream from their historical place of use. Raftopoulos also requested a new conditional water storage right to store up to 1440 A.F. of water at one or both of two proposed reservoirs (the Elk Ranch Reservoir and the Elk Ranch Reservoir, Lower Site) for multiple uses, including industrial and commercial uses. Following a trial, the water court issued an order and decree granting Raftopoulos' application.

¶ 11 Vermillion opposed Raftopoulos' application and now raises two claims on appeal. First, Vermillion challenges the water court's order to the extent that it interpreted 1974 change decrees concerning Raftopoulos' absolute rights in the Rouff Ditch No. 1 and the Yarnell Ditch No. 1. Specifically, Vermillion challenges the water court's interpretation of the phrase "and all other beneficial pur-

poses" in those decrees to permit industrial and commercial uses of that water, and the water court's conclusion that those uses had not been abandoned. In making this argument, Vermillion does not challenge the water court's ruling granting Raftopoulos' request to add alternate points of diversion for these ditches and change the place of use under those new diversion points to irrigate different lands. Second, Vermillion contends that the water court erred in granting Raftopoulos new conditional water storage rights for industrial and commercial purposes because Raftopoulos did not demonstrate a non-speculative need for that water for industrial and commercial purposes. Vermillion does not challenge Raftopoulos' conditional water storage rights for other decreed purposes. We vacate those portions of the water court's order interpreting the 1974 decrees and concluding that any industrial or commercial uses had not been abandoned. We reverse the water court's order and decree to the extent that it granted Raftopoulos conditional storage rights for industrial and commercial uses.

## A. Interpretation of the 1974 Decrees and Abandonment

### 1. Facts and Procedural History

¶ 12 Raftopolous owns absolute rights in the Rouff Ditch No. 1 and Yarnell Ditch No. 1.[2] The water rights in the Rouff Ditch No. 1 and Yarnell Ditch No. 1 were originally decreed in the 1890s for irrigation purposes. In 1973, the owner of those rights at the time, Mr. R.C. Buckley, filed two applications for changes of these water rights. The water court entered change decrees granting these applications in cases W–568–73 and W–569–73 ("the 1974 Decrees"). The 1974 Decrees enlarge the water rights and add new points of diversion. These decrees provide that uses for the Rouff Ditch No. 1 and the Yarnell Ditch No. 1 include "Irrigation, Do-

mestic, Stockwater *and all other beneficial uses.*" (Emphasis added).

¶ 13 In its application in Case No. 08CW89, Raftopoulos sought alternate points of diversion for these ditches to irrigate lands upstream from their historical place of use. Raftopoulos' application described the water as decreed for "Irrigation, Domestic, Stockwater and all other beneficial uses." Although nothing in the application indicated that Raftopoulos was seeking a change in use, Vermillion filed a statement of opposition contending, among other things, that Raftopoulos was attempting to expand the uses of its water rights in these ditches to include "all other beneficial uses," and that these rights should be limited to irrigation, domestic, and stock water uses only. Vermillion further contended that any uses of these rights other than irrigation, domestic, and stock watering had been abandoned.

¶ 14 At trial, Raftopoulos presented evidence regarding the historical use of the decreed water rights in the Rouff Ditch No. 1 and Yarnell Ditch No. 1 for irrigation and how that particular historical use would be unaffected by the requested alternate points of diversion. No evidence was presented that Raftopoulos intended to use the decreed water for any use other than irrigation.

¶ 15 Vermillion cross-examined Mr. R.C. Buckley, who filed the change applications that led to the 1974 Decrees, about his recollection regarding the purpose of the applications. Mr. Buckley testified that he believed there were uses besides irrigation and stock water that could be made of the diverted water. In its opposition case, Vermillion called Ms. Erin Light, the Division Engineer for Water Division 6, who testified that the office had interpreted and tabulated the 1974 Decrees for many years to include all other beneficial uses.[3] Finally, Vermillion's counsel questioned Mr. T.W. Dickinson, a partner in the Vermillion Ranch Limited Partnership, whether he knew if the water from Rouff

2. In its application, Raftopoulos requested changes to other existing absolute water rights in the Rouff Ditch No. 2 and the Yarnell Ditch No. 2. Those rights, which are decreed only for irrigation, are not at issue in this appeal.

3. Ms. Light further testified that she did not believe she could change her predecessor's tabulation, but that if she were presented with the decree for the first time, she would tabulate the original water right only to allow alternate points of diversion, and not to change the use.

Ditch No. 1 had been used for commercial purposes.

¶ 16 Raftopoulos' counsel objected to this line of questioning on grounds of relevancy and lack of jurisdiction, stating:

> We've had this dialogue before. The commercial purposes for the Yarnell and the Rouff No. 1 are not being changed. They're not the subject matter of this application. We continue to have inquiry about a beneficial use that is not the subject of this application. And frankly ... it's beyond the scope of the power of this Court to rule upon. So, this is not relevant. This inquiry about what water rights that are not in the application have or have not been used for is not relevant.

The water court overruled the objection, stating that it wanted to know whether the ditches "at any time had been used for commercial purposes," but neither the court nor Vermillion' s counsel explained why this evidence was relevant to Raftopoulos' application for alternate points of diversion for irrigation use only.

¶ 17 During closing argument, Raftopoulos' counsel made no mention of Raftopoulos using the decreed water at the requested new points of diversion for anything other than irrigation. Vermillion' s counsel, however, argued that by requesting a change in diversion points, Raftopoulos had opened the 1974 Decrees to interpretation, and that the phrase "all other beneficial uses" in the 1974 Decrees should not be interpreted to include industrial and commercial purposes. Vermillion requested that the court "clarify that in fact the application [for the 1974 Decrees] never contemplated changing the use" of the originally decreed water rights for the ditches. In the alternative, Vermillion argued that even if the 1974 Decrees could be interpreted as encompassing industrial and commercial uses, the evidence at trial established that Raftopoulos had abandoned those uses through nonuse.

¶ 18 In its findings of fact and conclusions of law, the water court found that Raftopoulos' request for a change in the ditch water rights was for "irrigation purposes only." The court explained:

> Applicant claims changes of several existing absolute water rights. These changes are summarized as follows: 1) an alternate point of diversion and place of use for the Rouff No. 1 and No. 2 Ditch to allow these water rights to divert at the Rafto Elk Ranch Ditch and its 10 alternate points of diversion *for irrigation use only;* and 2) an alternate point of diversion for the Yarnell Ditch No. 1 and Yarnell Ditch No. 2 to allow these water rights to divert at the Rafto Sparks Pipeline *for irrigation use only.* As described below, these water rights are decreed for irrigation, domestic, stock water, and all other beneficial purposes. *Applicant's intent is to only change the irrigation uses of these water rights to allow irrigation uses at the alternate points of diversion.* Applicant has not quantified the historical use for the other uses, which uses are not changed herein and will be allowed to be made the original points of diversion.

(Emphases added). The water court then proceeded to interpret the 1974 Decrees. Based on the 1973 applications, the testimony of Mr. Buckley, and the plain meaning of the decrees, the water court concluded that the 1974 Decrees changed the original appropriations of Rouff Ditch No. 1 and Yarnell Ditch No. 1 to allow these water rights to divert at multiple points of diversion for irrigation, domestic, stock water, and all other beneficial uses. The court observed that its finding was consistent with the testimony of the Division Engineer regarding her office's interpretation of the decrees and its tabulation of these water rights. Finally, the court found that, based on the evidence presented at trial, Raftopoulos had not abandoned the industrial and commercial uses decreed to Rouff Ditch No. 1 and Yarnell Ditch No. 1.

¶ 19 Thereafter, Vermillion filed a motion for post-trial relief, asking the court to reconsider its interpretation of the 1974 Decrees contending that even if the decrees could be interpreted as permitting industrial and commercial uses, those uses only pertained to the enlargements and alternate points of diversion granted in the 1974 Decrees, and thus did not change the use of the water granted in the original decree. Vermillion also asked the court to reconsider its finding regarding

abandonment. The water court denied the motion and reaffirmed its interpretation, concluding that the changes in the 1974 Decrees applied to the original decreed rights and the enlargements. It also declined to find abandonment of the industrial and commercial uses, reasoning that Raftopoulos had used the water to the full extent of the decreed right, albeit for another permitted use, namely irrigation.

### 2. Analysis

■ ¶ 20 Vermillion contends that the water court erred in interpreting the phrase "irrigation, domestic, stockwater and all other beneficial uses" in the 1974 Decrees pertaining to the Rouff Ditch No. 1 and Yarnell Ditch No. 1 to include industrial and commercial use of the decreed water. In addition, Vermillion argues that the water court erroneously rejected Vermillion's alternative arguments that (1) Raftopoulos had abandoned its use of the decreed water for industrial and commercial purposes, and (2) to the extent the 1974 Decrees can be interpreted to permit industrial and commercial uses, those additional uses pertain only to the enlargements and alternate points of diversion granted in the 1974 Decrees, and not the use of the water granted in the original decree.

¶ 21 The record establishes that Raftopoulos' application requesting alternate diversion points and a change in the place of use for the Rouff Ditch No. 1 and Yarnell Ditch No. 1 was limited to using that water *for irrigation*. Indeed, the water court expressly found that Raftopoulos' intent was only to "change the irrigation uses of these water rights to allow irrigation uses at the alternate points of diversion," and counsel for Vermillion conceded at oral argument before this court that Raftopoulos' change application was limited to use of the water for irrigation. Thus, the issue regarding the interpretation of the phrase "all other beneficial uses" in the 1974 Decrees was not presented by Raftopoulos' application, but rather, was injected into the case by Vermillion. But Vermillion did not establish, and the record does not reveal, how the issue was relevant, let alone necessary, to adjudicate Raftopoulos' application for alternate points of diversion and

change in the place of use for irrigation purposes only.

¶ 22 We conclude that any issue regarding Raftopoulos' right to use the decreed water in the Rouff Ditch No. 1 and Yarnell Ditch No. 1 for commercial or industrial purposes was not properly before the water court. Given the limited scope of Raftopoulos' application with respect to these water rights, the water court had no reason to interpret the phrase "all other beneficial uses" in the 1974 Decrees or to decide whether Raftopoulos had abandoned any right to use the decreed water for commercial or industrial purposes. Accordingly, we vacate those portions of the water court's order.

### B. Raftopoulos' Request for Conditional Water Storage Rights for Industrial and Commercial Purposes

¶ 23 Vermillion further contends that the water court erred in decreeing conditional water storage rights to Raftopoulos for industrial and commercial purposes because Raftopoulos failed to demonstrate a nonspeculative intent to put the appropriated water to those uses, and failed to show that its existing absolute water rights were insufficient to meet those uses. The water court decreed the conditional storage rights for multiple uses (including irrigation, stock watering, fire protection, and wildlife watering, as well as fishery and evaporation at one of the two sites). Vermillion's appeal challenges the decree of conditional storage rights only to the extent that it permits the stored water to be used for industrial and commercial purposes. We agree that Raftopoulos failed to meet its burden of establishing that its intent to use the water for industrial and commercial purposes was nonspeculative, and therefore reverse the water court's decree to the extent that it permits the water to be used for industrial and commercial uses.

### 1. Facts and Procedural History

¶ 24 Raftopoulos owns a previously decreed conditional storage right to store 500 A.F. in Elk Ranch Reservoir. In its application in this case, Raftopoulos sought a second enlargement of that conditional storage right

to store an additional 940 A.F. in Elk Ranch Reservoir (for a total of 1440 A.F.) for purposes of irrigation, stock watering, industrial and commercial uses, fire protection, and wildlife watering. Raftopoulos also sought a new conditional water storage right to store 1120 A.F. in a different proposed reservoir, the Elk Ranch Reservoir, Lower Site, for the same uses as the proposed Elk Ranch Reservoir, plus fishery and evaporation.[4] At trial, John Raftopoulos, a fifty-percent owner of Raftopoulos Brothers, testified that the partnership was seeking conditional storage rights for both reservoir sites, but that it would choose the best site after evaluation and build only one of the reservoirs.

¶ 25 With respect to Raftopoulos' intent to use the stored water for industrial and commercial purposes, Mr. Raftopoulos testified that "there's lots of oil and gas exploration going on in that area," and mentioned that a third-party, Questar, has "been working on a plan for 4000 wells over the next twenty years," but he provided no further details about that plan, including whether that plan was finalized. When asked by Vermillion's counsel on cross-examination to estimate what he could expect to sell to Questar or another energy producer, Mr. Raftopoulos was unable to provide a quantity. Raftopoulos' expert, Mr. Paul Currier, P.E., testified that oil and gas operations typically used four to seven acre feet per well, but Mr. Currier never clarified whether the wells that Questar was purportedly planning to operate on Raftopoulos' property would require the same or similar quantities of water. Mr. Currier provided no information in his testimony or his report about anticipated quantities of water to be used for commercial purposes.

¶ 26 Mr. Raftopoulos also testified that the partnership has "mineral rights up on the mountain and other areas" that could benefit from the water. However, he provided no time frame for developing those mineral rights, nor did he provide any estimate of the

quantity of water needed for such development.

¶ 27 Finally, Raftopoulos presented a contract between it and Moffat County to provide water for dust suppression on county roads. The 2010 contract was entered into more than thirteen months after Raftopoulos' application was filed. The contract, however, does not require the county to purchase or use any specific quantity of water, nor did Mr. Raftopoulos testify to any estimates on the quantity of water the county might reasonably use. Moreover, the contract indicates that the water to be provided could be sourced not only from Raftopoulos' rights in Talamantes Creek, but also from separate rights in another ditch. Mr. Raftopoulos briefly mentioned that in the month before trial, the partnership had entered into a contract with Precision Excavating to deliver water, but that contract was never entered into evidence, and Mr. Raftopoulos offered no details regarding its terms.

¶ 28 In its order, the water court concluded that Raftopoulos had met its burden under section 37–92–103(3)(a) to demonstrate a non-speculative intent to use the water for commercial and industrial purposes. It stated:

> The court ... finds that [Raftopoulos] has demonstrated a non-speculative intent to put water to a beneficial use for industrial uses within Moffat County, Colorado ... [Raftopoulos] owns mineral rights ... that may be developed in the future. Water will be needed for the development of these rights as well as the rights and leases of third parties. Two to four thousand wells may be developed in the area supplied by these rights. Each of these wells may need four to seven acre feet of development water. These rights, [Raftopoulos' and Vermillion's] are the only water source for a thirty to forty mile[ ] radius. No one can seriously contest the need for this water. Water has been sold to the developers of existing wells from the basin, fracturing of gas wells is an existing

**4.** The 1120 A.F. to be stored at the Elk Ranch Reservoir, Lower Site, included storage of 500 A.F. previously decreed as a conditional storage right for the Elk Ranch Reservoir. Raftopoulos requested a change of water rights as part of his application to store this 500 A.F. in the Elk Ranch Reservoir, Lower Site, as an alternate place of storage. That requested change of water right, which was granted by the water court, is not at issue in this appeal.

technology available to well owners in the vicinity and this basin is geographically advantageously located to meet the future demand for water. Based on these facts these applications [for conditional water storage rights] for industrial and commercial use are found not to be speculative.

¶ 29 The water court granted Raftopoulos' application for conditional storage rights in the Elk Ranch Reservoir (second enlargement) and the Elk Ranch Reservoir, Lower Site. The water court's decree for these rights provides that Raftopoulos may build one or both reservoirs, provided that the total storage amount does not exceed 1440 A.F. of capacity. The decree for both structures provides for multiple uses at each site, including industrial and commercial uses.

### 2. Analysis

¶ 30 Vermillion contends that the water court erred in decreeing Raftopoulos' conditional water storage rights at the Elk Ranch Reservoir and the Elk Ranch Reservoir, Lower Site to the extent that the decree permits the water to be used for industrial and commercial purposes. Vermillion contends that these commercial and industrial uses for the water were speculative because Raftopoulos presented no evidence of any plan to develop mineral rights, no evidence of any quantity of water required to meet the Moffat County contract for dust suppression, and no evidence that its existing absolute water rights would be insufficient to meet any anticipated need for commercial and industrial water.

¶ 31 "Whether an applicant has met the legal standards for a conditional appropriation presents mixed questions of law and fact that we review de novo." *Pagosa Area Water & Sanitation Dist. v. Trout Unlimited,* 219 P.3d 774, 779 (Colo.2009) (*Pagosa II*). "We defer to the water court's findings of fact unless the evidence is wholly insufficient to support those determinations." *Id.*

¶ 32 Section 37–92–103(6), C.R.S. (2012), defines a conditional water right as "a right to perfect a water right with a certain priority upon the completion with reasonable diligence of the appropriation upon which

such right is to be based." A conditional water right preserves an applicant's position in the priority system while the applicant takes the necessary steps (such as obtaining financing, complying with regulatory and access requirements, and completing engineering, etc.) to put the appropriated water to beneficial use. *See City of Black Hawk v. City of Central,* 97 P.3d 951, 956 (Colo.2004).

¶ 33 To obtain a conditional water right, an applicant bears the burden to demonstrate that: (1) it has taken a "first step," which includes an intent to appropriate the water and an overt act manifesting such intent; (2) its intent is not based on a speculative sale or transfer of the water to be appropriated; and (3) there is a substantial probability that the applicant "can and will" complete the appropriation with diligence and within a reasonable time. *City of Aurora v. ACJ P'ship,* 209 P.3d 1076, 1083 (Colo. 2009) (citing *Pagosa Area Water & Sanitation Dist. v. Trout Unlimited,* 170 P.3d 307, 314 (Colo.2007) (*Pagosa I*)).

¶ 34 The right to appropriate water does not include a right to speculate as to the future use and possible sale of the water. *See Colo. River Water Conservation Dist. v. Vidler Tunnel Water Co.,* 197 Colo. 413, 417, 594 P.2d 566, 568 (1979). Section 37–92–103(3)(a), which codified the anti-speculation principle articulated in *Vidler,* provides that no appropriation of water, either absolute or conditional, can be held to occur when the proposed appropriation is based on the speculative sale or transfer of the appropriative rights to persons not parties to the proposed appropriation; a speculative sale or transfer is evident where the appropriator does not have "a *specific plan* and intent to divert, store ... and *control a specific quantity of water* for specific beneficial uses." *See* § 37–92–103(3)(a), (3)(a)(II), C.R.S. (2012) (emphasis added).

¶ 35 Finally, an applicant for a conditional water right must demonstrate that it needs the amount of water it claims. *Upper Yampa Water Conservancy Dist. v. Dequine Family L.L.C.,* 249 P.3d 794, 800 (Colo.2011); *see also Rocky Mountain Power Co. v. Colo. River Water Conservation Dist.,* 646 P.2d

383, 388 (Colo.1982) ("[A] claimant of a conditional water right must substantiate a need for the claimed water by showing, at the least, a contractual or an agency relationship with those who are to put the water to a beneficial use."). Need cannot be based on the speculative sale or transfer of appropriative rights. *Upper Yampa Water Conservancy Dist.*, 249 P.3d at 800.

¶ 36 Here, the water court concluded that Raftopoulos met its burden to demonstrate a non-speculative intent to use the requested water for commercial and industrial purposes. The water court reached this conclusion based on Mr. Raftopoulos' testimony that two to four thousand wells "may be developed in the area supplied by these rights" and that such wells "may need four to seven acre feet of development water"; Mr. Raftopoulos' testimony that the partnership owns mineral rights in Moffat County that "may be developed in the future"; evidence of a contract to supply water to Moffat County for dust suppression; and the contract with Precision Excavating obtained in the month before trial. The water court further observed that the parties' water rights are the only water source for a thirty- to forty-mile radius; that water has been sold to the developers of existing wells from the basin; that fracturing of gas wells is a technology available to well owners in the vicinity; and that this basin is geographically well located to meet the future demand for water.

¶ 37 This evidence does not, however, support a conclusion that Raftopoulos demonstrated a non-speculative need for the water for industrial and commercial purposes. The mere fact that wells "may be developed in the area" or that the partnership owns mineral rights that "may be developed in the future," without evidence of actual plans for such activities, does not demonstrate a non-speculative intent to actually put the water to beneficial use. Moreover, Raftopoulos provided no estimate of the quantity of water that might be needed for such activities.

¶ 38 Similarly, the Moffat County contract does not require the county to purchase or use any specific quantity of water, nor did Raftopoulos proffer any evidence or even any estimate of the quantity of water the county

might reasonably use. The Precision Excavating contract, briefly mentioned in Mr. Raftopoulos' testimony, was never offered into evidence, and nothing in the record reflects the terms of that arrangement. Both contracts were executed long after Raftopoulos filed the application in this case. *See Bd. of Cnty. Comm'rs v. United States (In re the Application for Water Rights of the Bd. of Cnty. Comm'rs)*, 891 P.2d 952, 963–65 (Colo. 1995) (rejecting the argument that an applicant should be "allowed to offer evidence of its ongoing efforts to obtain commitment for the water sought in its application for a conditional decree up to and including the date of trial" and concluding that the requirement for obtaining a conditional water right must be established "at the time the application was made"). Finally, Raftopoulos presented no evidence that these possible future demands could not be met through Raftopoulos' existing absolute water rights.

¶ 39 While we do not question the credibility of this undisputed testimony or otherwise discount this evidence, we conclude that it is insufficient, as a matter of law, to demonstrate a non-speculative intent to put the water to beneficial use. Absent any quantification of the anticipated demand for such water, Raftopoulos did not demonstrate a non-speculative need for water for industrial and commercial purposes. In short, the water court erred in determining that Raftopoulos met its burden to demonstrate a "specific plan" to store "a specific quantity of water" for industrial and commercial purposes. § 37–92–103(3)(a)(II). Accordingly, we reverse the water court's decree granting Raftopoulos conditional water storage rights for the Elk Ranch Reservoir and the Elk Ranch Reservoir, Lower Site, to the extent the decree permits that appropriated water to be used for industrial and commercial purposes.

## II. Case No. 11SA124—Vermillion's Applications (06CW61 & 08CW54)

¶ 40 In this appeal, we consider the water court's ruling on two applications filed by Vermillion seeking a finding of reasonable diligence with respect to its previously decreed conditional water storage rights (Case

No. 08CW54), and seeking to obtain new conditional storage rights for industrial and commercial purposes (Case No. 06CW61). The applications concern the same four proposed reservoir structures.

¶ 41 The water court initially denied both applications on grounds that Vermillion failed to satisfy the "can and will" standard of section 37–92–305(9)(b). However, the water court later reversed its rulings and entered decrees granting Vermillion a finding of reasonable diligence in Case No. 08CW54, and granting Vermillion' s request for a new conditional water storage right in Case No. 06CW61.

¶ 42 Raftopoulos contends that the water court erred in granting both applications because Vermillion failed to meet its burden of establishing, pursuant to section 37–92–305(9)(b), a substantial probability that the reservoirs "can and will" be completed with diligence and within a reasonable time. Raftopoulos argues that the water court applied an incorrect standard by effectively shifting the burden to Raftopoulos, as the opposer, to prove the impossibility of construction.

¶ 43 We conclude that Vermillion failed to demonstrate through evidence at trial that it "can and will" complete the reservoirs as required by section 37–92–305(9)(b). We therefore reverse the water court's order in both cases.

## A. Applicable Law

¶ 44 As discussed above with respect to Raftopoulos' application, to obtain a conditional water right, an applicant bears the burden to demonstrate that: (1) it has taken a "first step," which includes an intent to appropriate the water and an overt act manifesting such intent; (2) its intent is not based on a speculative sale or transfer of the water to be appropriated; and (3) there is a substantial probability that the applicant "can and will" complete the appropriation with diligence and within a reasonable time. *ACJ P'ship*, 209 P.3d at 1083 (citing *Pagosa I*, 170 P.3d at 314).

¶ 45 The "can and will" statute, which serves to impose limitations on granting ap-

plications for conditional water rights, provides:

> No claim for a conditional water right may be recognized or a decree therefor granted except to the extent that it is established that the waters can be and will be diverted, stored, or otherwise captured, possessed, and controlled and will be beneficially used and that the project can and will be completed with diligence and within a reasonable time.

§ 37–92–305(9)(b).

The General Assembly enacted the "can and will" statute "to reduce speculation associated with conditional decrees and to increase the certainty of the administration of water rights in Colorado." *FWS Land & Cattle Co. v. State Div. of Wildlife*, 795 P.2d 837, 840 (Colo.1990). The statute goes beyond the anti-speculation doctrine of *Vidler*, 197 Colo. at 417, 594 P.2d at 568, by requiring an applicant seeking a conditional water right decree to demonstrate that the water "can and will" be beneficially used. *Bd. of Cnty. Comm'rs v. United States*, 891 P.2d at 961. Specifically, an applicant for conditional water rights must demonstrate a " 'substantial probability that within a reasonable time the facilities necessary to effect the appropriation can and will be completed with diligence.' " *ACJ P'ship*, 209 P.3d at 1083 (quoting *Bd. of Cnty. Comm'rs v. United States*, 891 P.2d at 961).

¶ 46 Once granted, conditional rights remain subject to continued scrutiny to prevent the hoarding of priorities. *Dallas Creek Water Co. v. Huey*, 933 P.2d 27, 35 (Colo.1997). Accordingly, the legislature requires holders of conditional rights to prove "reasonable diligence" by demonstrating "the steady application of effort to complete the appropriation in a reasonably expedient and efficient manner under all the facts and circumstances." § 37–92–301(4)(b). The holder of a conditional right must file an application for a finding of reasonable diligence every six years or the right shall be considered abandoned. § 37–92–301(4)(a)(I), C.R.S. (2012). In other words, to maintain the conditional rights, the applicant must show continued intent and progress toward finalizing the

conditionally decreed appropriation. *Dallas Creek Water Co.,* 933 P.2d at 36.

¶ 47 We have observed that the very nature of a conditional water right suggests that the "can and will" test applies until the right matures into an absolute decree. *Mun. Subdistrict, N. Co. Water Conservancy v. OXY USA, Inc.,* 990 P.2d 701, 708 (Colo. 1999). Therefore, to show reasonable diligence in developing a conditional right, an applicant must demonstrate not only "steady application of effort" as required by section 37–92–301(4)(b), but also that the waters "can and will" be stored and beneficially used and that the project "can and will" be completed with diligence and within a reasonable time, as required by section 37–92–305(9)(b). *See Natural Energy Res. Co. v. Upper Gunnison River Water Conservancy Dist.,* 142 P.3d 1265, 1277 (Colo.2006).

¶ 48 The "can and will" test is a balancing test that considers several relevant factors, including but not limited to the legal and physical availability of unappropriated water, *see Buffalo Park Dev. Co. v. Mountain Mut. Reservoir Co.,* 195 P.3d 674, 683 (Colo.2008); the technical feasibility of a project, *see City of Black Hawk,* 97 P.3d at 958–59; the applicant's present right and prospective ability to access the property, *see id.* at 957; the applicant's ability to obtain necessary permits for construction, *see Bd. of Cnty. Comm' rs v. Crystal Creek Homeowners' Ass'n,* 14 P.3d 325, 344 (Colo.2000); and the economic feasibility of a project, *see Pub. Serv. Co. of Colo. v. Bd. of Water Works,* 831 P.2d 470, 478 (Colo.1992). The key inquiry is whether " 'evidence of factors supporting the substantial probability of future completion is sufficient to outweigh the presence of future contingencies.' " *ACJ P'ship,* 209 P.3d at 1085 (quoting *City of Thornton v. Bijou Irr. Co.,* 926 P.2d 1, 45 (Colo.1996)). Whether an applicant has met the "can and will" requirement presents a mixed question of fact and law. *See Buffalo Park Dev. Co.,* 195 P.3d at 683. We accept

the water court's factual finding unless clearly erroneous, *see City of Black Hawk,* 97 P.3d at 956, and review de novo whether those factual findings suffice to satisfy the statutory requirement, *see Bijou Irr. Co.,* 926 P.2d at 40.

**B. Discussion**

¶ 49 In 1975, Vermillion was decreed a conditional water right to store 1200 A.F. at a proposed storage site, the Sparks Reservoir. In 2003, this conditional right was changed to include three additional, alternate places of storage—the Sparks 1A Reservoir, the Sparks 1B Reservoir, and the House Reservoir. The conditional decree allows water to be stored at any of the structures so long as combined yearly storage does not exceed 1200 A.F. The stored water may be used for livestock and irrigation under its original priority date, and for additional recreational, domestic, fish propagation, and reservoir evaporation uses under a priority date of August 31, 2001.

¶ 50 The four proposed reservoir sites are unique as to location, soil conditions, engineering factors, hydrology considerations and other characteristics. The Sparks, Sparks 1A, and Sparks 1B would be on-channel reservoirs located on Talamantes Creek. The House Reservoir is located on a tributary to Talamantes Creek.[5] The Sparks and Sparks 1A would be situated on property owned by Raftopoulos. If constructed, they would inundate lands and water rights owned by Raftopoulos.[6] In addition, the Sparks and the House reservoirs, if constructed, may inundate state or federal lands.

¶ 51 In Case No. 08CW54, Vermillion filed an application pursuant to section 37–92–301(4)(a)(I) for a sexennial finding of reasonable diligence with respect to its previously decreed water storage right for the proposed Sparks Reservoir and the three alternate reservoir locations. In Case No. 06CW61, Vermillion filed an application requesting a

---

5. A small dam at the House Reservoir has been constructed to hold twenty A.F. under an existing and separate water right not at issue here. It would need to be enlarged to hold all or a portion of the conditional water rights at issue in this case.

6. The Sparks Reservoir overlaps with Raftopoulos' proposed Elk Ranch Reservoir, Lower Site, one of the water structures at issue in Case No. 11SA86.

conditional water right to store an additional 1200 A.F. of water at the four reservoirs for industrial and commercial uses in the area. Specifically, the application states that the stored water is to be used for the "[d]rilling and completion of wells, [r]oad and well pad construction, [and] dust suppression." Raftopolous filed statements of opposition to both of Vermillion's applications.

¶ 52 The water court held a combined trial on both applications. Vermillion presented testimony from its expert, Mr. Charles M. Applegate, P.E., regarding the physical and legal availability of water for the new conditional storage right in Case No. 06CW61. Mr. Applegate did not testify regarding the technical feasibility of constructing any of the reservoirs, and Vermillion presented no other expert testimony on the technical feasibility of the reservoirs in either Case No. 08CW54 or Case No. 06CW61.

¶ 53 Vermillion also presented the lay testimony of Mr. T. Wright Dickinson, a partner in Vermillion Ranch Limited Partnership. Mr. Dickinson testified to the intent of the application for the new conditional storage right in Case No. 06CW61 for industrial, commercial, and domestic[7] purposes. He also testified regarding the activities undertaken to develop Vermillion's existing conditional water storage rights for purposes of the reasonable diligence proceeding in Case No. 08CW54, namely, that: (1) Vermillion had applied for the new conditional water rights in Case No. 06CW61 to supply oil and gas development in the area, the revenues from which he believed would assist in making the reservoir structures more economically feasible; (2) Vermillion had applied to the Colorado Water Conservation Board for a grant to conduct a "geotechnical study and preliminary feasibility analysis" of one of the four reservoir locations; and (3) Vermillion had retained an engineer, Robert Johnson, to develop conceptual drawings for Sparks 1A.

¶ 54 Vermillion presented no evidence regarding a timeline for construction, the costs of construction,[8] the costs of land acquisition, the status of necessary permits or government approvals, or the technical feasibility, design, or construction of the reservoirs.

¶ 55 In opposition to both applications, Raftopoulos presented the testimony of its expert, Mr. Paul Currier, P.E., regarding the permits that Vermillion would have to obtain, the land that would have to be condemned for construction, and the possible costs of construction. He also discussed a Preliminary Subsurface Exploration and Geotechnical Engineering Report prepared by Ingberg–Miller Engineers for Vermillion that provided a geotechnical engineering analysis for the Sparks 1A location. Mr. Currier quoted the report as concluding that the soils underlying the proposed Sparks 1A are "highly susceptible to liquefaction and severe deformation under seismic load," and that the soils around the south end of the proposed dam are subject to subsurface erosion and relatively high seepage. Based on this report, Mr. Currier opined that the soil conditions at the Sparks 1A make it "extremely difficult" physically and financially to build this site, and that from a permitting standpoint, it would be extremely difficult to convince the Colorado State Engineer that the site was safe to construct a reservoir. Mr. Currier estimated that the design and construction costs for the Sparks 1A could total between $1.5 and $2 million, not including the cost of land acquisition or the cost of addressing the soil conditions.

¶ 56 Following the trial, the water court entered its Findings of Fact, Conclusions of Law, and Order denying Vermillion's applications in both cases because Vermillion failed to meet the statutory "can and will" requirement under section 37–92–305(9)(b). In analyzing that requirement, the court noted that it was obligated to consider "all relevant factors," including but not limited to "economic feasibility, available material, labor, and equipment, economic ability of the applicant, permits required, and delay fac-

---

7. The water court concluded that Vermillion's proposed domestic uses of the water were speculative. Vermillion does not challenge that conclusion.

8. The Johnson report commissioned by Vermillion included a cost estimate for Sparks 1A but this report was offered for the limited purpose of demonstrating diligence activities and not to establish the cost of any of the reservoirs.

tors." The water court found that, based on the testimony of Mr. Currier, obtaining dam permits presented major impediments because of the soil conditions, and that "the condemnation of [Raftopoulos'] property will be also be a major impediment to the Sparks Reservoir." The court observed that the cost of building one of these structures "at a minimum, will exceed three-quarters of a million dollars" and that necessary permits, required special building techniques, and condemnation would substantially increase the cost of construction. The water court concluded that Vermillion had presented little or no evidence of the economic feasibility of the projects. It found that Vermillion "refused to provide any meaningful testimony as to its economic ability to actually build any of the storage structures" and that Vermillion presented no evidence showing the value or volume of water previously sold (the revenues from which purportedly would make building the reservoirs more economically feasible), no evidence that it has the equipment or labor available to it to build the structures, and no evidence of any other source of financing the costs of construction or land acquisition.

¶ 57 After considering all the relevant evidence, the water court concluded that Vermillion "failed to prove by a preponderance of the evidence that there is a substantial probability that it 'can and will' complete these appropriations, with diligence, within a reasonable time." The water court therefore denied Vermillion' s applications in both cases.

¶ 58 Vermillion filed a motion for post-trial relief, contending that the water court misapplied the "can and will" test by relying heavily, if not solely, on "economic feasibility" to conclude that Vermillion had not satisfied the "can and will" statute. Specifically, Vermillion argued that the water court erred because no case law "suggests [that] economic feasibility alone is sufficient to deny conditional water rights" and that a project's contingencies should not defeat an application for a conditional water right unless they render the project impossible. It further argued that only "cursory" estimates of the reservoirs' costs were provided by Raftopou-

los and that no evidence was introduced that those costs, "even if true, are beyond Vermillion' s financial capability."

¶ 59 In a revised order, the water court concluded that it had misapplied the "can and will" statute. The court noted that in its original order, it had applied what it considered the plain meaning of the statute with regard to "substantial probability" and "reasonable time." The water court stated that it had relied upon "the totality of the evidence or lack of evidence presented by [Vermillion]" and had based its conclusion that Vermillion had failed to meet the "can and will" requirement on two major factors: the impediments created by the soil conditions, condemnation, and permitting required before some of the reservoirs could be built; and the lack of meaningful evidence regarding Vermillion' s financial ability to build the dams, particularly in view of the potential costs.

¶ 60 The water court determined that it had applied the "can and will" standard too rigidly when it reviewed the evidence, and reasoned that the application should be denied "only if the impediments make it impossible for the applicant" to complete the appropriation. Citing *Public Service Co. of Colorado v. Blue River Irr. Co.*, 782 P.2d 792, 794 (Colo.1989) *(Blue River II)*, *Public Service Co. of Colorado v. Bd. of Water Works*, 831 P.2d 470, 478–79 (Colo.1992), and *Southeastern Co. Water Conservancy District v. City of Florence*, 688 P.2d 715, 717 (Colo. 1984), the water court further reasoned that "economic feasibility is not a burden imposed on the applicant in order to establish reasonable diligence" and that "economic feasibility will not support the rejection of an application for a conditional water right unless substantial evidence is presented to show the lack of economic feasibility." The water court therefore reversed its ruling and entered decrees granting Vermillion a finding of reasonable diligence in Case No. 08CW54, and granting Vermillion' s request for a new conditional water storage right in Case No. 06CW61. In so doing, the water court made no factual findings as to whether Vermillion' s activities during the diligence period demonstrated a steady application of effort to

develop its conditional water right required by section 37–92–301(4)(b) to demonstrate reasonable diligence.

¶ 61 Raftopoulos contends that the water court erred in granting Vermillion' s applications for a reasonable diligence finding in Case No. 08CW54 and for a new conditional storage right in Case No. 06CW61. Raftopoulos argues that the water court applied an incorrect "can and will" standard that absolved Vermillion of its burden to prove project feasibility and shifted that burden to Raftopoulos, as the opposer, to prove the impossibility of construction. Raftopoulos contends that in both cases, Vermillion failed to meet its burden of establishing, pursuant to section 37–92–305(9)(b) that the reservoirs "can and will" be completed with diligence and in a reasonable time. We agree and reverse.[9]

¶ 62 The record supports the water court's initial conclusion drawn from the evidence at trial. Vermillion presented no evidence in Case Nos. 08CW54 or 06CW61 regarding the technical feasibility of any of the reservoirs, no studies regarding the proposed locations, no testimony regarding the ability to obtain necessary permitting, and no estimates of the cost of construction or Vermillion' s ability to finance such costs. Raftopoulos, on the other hand, presented expert testimony that raised serious questions about the feasibility of the Sparks 1A in light of the conclusions in the Ingberg–Miller report regarding the soil conditions at that location. In addition, Raftopoulos' expert testified that total design permitting and construction costs for the Sparks 1A could be between $1.5 and $2 million, not including the cost of land acquisition or the

cost of addressing the soil conditions. This evidence raised serious doubts as to whether the project "can and will" be completed with diligence and within a reasonable time. After considering all of the evidence in both cases, the water court correctly concluded that Vermillion' s evidence of factors supporting the substantial probability of future completion of the project were not sufficient to outweigh the presence of contingencies identified by Raftopoulos. *See ACJ P'ship,* 209 P.3d at 1085.

¶ 63 In reversing its ruling, the water court did not alter its initial findings, but rather, simply applied a different standard to the evidence presented, reasoning that "only if the impediments make it impossible for the applicant to construct diversions does the Court have a basis to deny an[ ] application under the can and will requirement." Raftopoulos contends that this articulation of the standard was erroneous. We agree. In reasoning that the application should be denied under the "can and will" requirement "only if the impediments make it impossible" for the applicant to complete the appropriation, the water court cited *City of Black Hawk,* 97 P.3d at 956–67, and *Bijou Irr. Co.,* 926 P.2d at 42.[10] However, the cases cited by the water court do not support its conclusion. As a preliminary matter, our case law has recognized that the standard governing a public entity's request for a conditional water right is generally more "flexible" than the showing required for a private entity to secure the same. *See Bijou Irr. Co.,* 926 P.2d at 38, 47 ("[W]e do not read the requirements of firm contractual commit-

9. Raftopoulos also contends that, in reversing its ruling and granting Vermillion' s request for a finding of reasonable diligence in Case No. 08CW54, the water court failed to make findings of fact as to whether Vermillion' s activities during the diligence cycle demonstrated the "steady application of effort" to develop its conditional storage right required under section 37–92–301(4)(b). Because we reverse on the ground that Vermillion failed to meet the "can and will" requirement, we need not reach this contention.

10. The water court also cited *Dallas Creek Water Co.,* 933 P.2d at 36, for the proposition that where more than one site is proposed, only when all of them are found impossible can a court deny a finding of diligence. However, the cita-

tion relied on by the water court simply observes that "when a project is comprised of several features, work on one feature can be considered in determining whether reasonable diligence has been shown in the development of water rights for all features." Finally, the water court cited *City of Thornton v. Clear Creek Water Users Alliance,* 859 P.2d 1348 (Colo.1993), for the proposition that an applicant can pursue possible unidentified alternative sites even when decreed sites are unavailable. However, the opposers in that case conceded that the applicant met the "can and will" requirement; thus, the issue was not before the court. *Clear Creek Water Users Alliance,* 859 P.2d at 1352–53.

ments or agency relationships applied to private parties in *Vidler* to apply with equal force to municipalities."); *see also City & Cnty. of Denver v. Sheriff*, 105 Colo. 193, 201, 96 P.2d 836, 840–41 (1939) (emphasizing "the necessity of preserving the flexibility of municipalities to exercise their managerial judgment in resolving their water supply problems"). Therefore, the "strict requirements" that apply to private applicants seeking a conditional water right do not apply "equally to municipal applicants." *See Bijou Irr. Co.*, 926 P.2d at 37; *Pagosa I*, 170 P.3d at 315 ("A governmental agency need not be certain of its future water needs; it may conditionally appropriate water to satisfy a projected normal increase in population within a reasonable planning period.").

¶ 64 Moreover, neither case cited by the water court stands for the proposition that an application should be denied under the "can and will" standard "only if the impediments make it impossible" for the applicant to complete the appropriation. To the contrary, they reaffirm the principle that the "can and will" standard is a balancing test that turns on several factors.

¶ 65 In *City of Black Hawk*, we upheld the water court's finding that Black Hawk had adequately satisfied the access to property requirement of the "can and will" test because Central City's nonbinding, general resolution declaring its intent not to enter into agreements with third parties seeking to use its property to construct water projects did not have the same effect of denying access to property as the final governmental denials of authorization in *FWS Land & Cattle Co. v. State Div. of Wildlife*, 795 P.2d 837 (Colo. 1990) and *West Elk Ranch, L.L.C. v. United States*, 65 P.3d 479 (Colo.2002). *City of Black Hawk*, 97 P.3d at 957–58. We based our holding on the fact that the lack of current access to property is not typically dispositive of whether the "can and will" test is satisfied, and on the water court's finding that Black Hawk had satisfied all the other requirements of the "can and will" statute. *Id.* at 958. Notably, in that case, Black Hawk's expert "provided sufficient evidence of technical feasibility" of the proposed reser-

voir at issue to satisfy the "can and will" test. *Id.* at 959.

¶ 66 In *Bijou Irr. Co.*, we held that the presence of future contingencies was a nondispositive factor to be considered in combination with other relevant factors in determining whether the applicant established a substantial probability of completing the project. 926 P.2d at 43–44. We concluded that, despite the contingencies in that case (substitute supply water, additional storage capacity, and certain contracts to allow completion of a ditch exchange), "the record as a whole contains sufficient evidence to establish a substantial probability that Thornton can and will complete the [project] with diligence and within a reasonable time." *Id.* at 44. Namely, Thornton presented evidence establishing, among other things, that unappropriated water was available; that it had secured stipulations with the owners of most of the existing structures; that it had invested $73 million and 35,000 consultant work hours on project analysis, planning and design; and that the city could pay for completion of the project. *Id.*

¶ 67 Although we have declined to hold that an applicant has the burden of proof regarding the economic feasibility of a project, economic feasibility remains a relevant factor in determining whether an applicant has met the "can and will" test. *Blue River II*, 782 P.2d at 794 ("The economic feasibility of the proposed development certainly is one relevant factor, especially where, as here, the applicant has had many years in which to investigate various prospects for financing, design, and construction.") (quoting *Pub. Serv. Co. of Colo. v. Blue River Irr. Co.*, 753 P.2d 737, 742 (Colo. 1988) *(Blue River I))*. Thus, the failure to present evidence regarding economic feasibility may be a factor leading to the conclusion that the applicant has no present intent to build the project. *Pub. Serv. Co. of Colo. v. Bd. of Water Works*, 831 P.2d at 478–79.

¶ 68 These cases do not suggest that a court has no basis to deny an application under the "can and will" requirement unless the impediments make the project impossible to complete. Rather, they accord with the general principles that the applicant bears

the burden of proving, through evidence, a substantial probability that the project can and will be completed, with diligence and within a reasonable time, and that whether an applicant has demonstrated that it has met the "can and will" requirement is a balancing test that examines several relevant factors.

¶ 69 Thus, it was certainly not Raftopoulos' burden as the opposer to prove that the project is technically or economically impossible. To the contrary, the burden of proof always "falls squarely on the shoulders of the applicant for a conditional water right decree," *Bd. of Water Works*, 831 P.2d at 480, and Raftopoulos is entitled to hold Vermillion to "strict proof" of its claims. *See Buffalo Park Dev. Co.*, 195 P.3d at 686. To the extent that Raftopoulos presented evidence of contingencies or impediments, Vermillion's burden was not to show that those contingencies failed to render the project "impossible." Rather, Vermillion had the burden to show a "substantial probability" that the requested water "can and will" be stored and that the reservoir projects "can and will be completed with diligence and within a reasonable time," notwithstanding the known impediments or contingencies that may occur.

¶ 70 That burden is not met where, as here, Vermillion presented no evidence regarding a timeline for construction, the costs of construction and land acquisition, the ability to finance those costs, the status of necessary permits or government approvals, or the technical feasibility, design, or construction of the reservoirs. In addition, Vermillion offered no evidence to rebut the economic and technical feasibility issues raised by Raftopoulos. Although Vermillion sought new conditional storage rights in Case No. 06CW61, these rights were for the same four structures for which it has held a conditional storage decree since 1975. Vermillion, however, is virtually no closer today to building any of these proposed reservoirs than when the conditional right was first decreed more than 35 years ago. *See OXY USA, Inc.*, 990 P.2d at 708 (stating that to show reasonable diligence in a conditional right, an applicant must demonstrate not only "steady application of effort" as required by section 37–92–301(4)(b), but also that the waters "can and will" be stored and beneficially used and that the project "can and will" be completed with diligence and within a reasonable time, as required by section 37–92–305(9)(b)).

¶ 71 We conclude that Vermillion failed to meet its burden to prove by a preponderance of the evidence at trial that there is a substantial probability that the reservoirs necessary to effect the appropriation "can and will" be completed with diligence within a reasonable time. *Natural Energy Res. Co.*, 142 P.3d at 1277 ("[T]he 'substantial probability' standard is employed to curb indefinite speculation, not to protect a conditional water right where only the thinnest possibility remains that the project can and will be completed."). Accordingly, we reverse the water court's grant of a conditional water storage right for the Sparks Reservoir and the three alternate storage locations in Case No. 06CW61. In addition, we reverse the water court's order in Case No. 08CW54 concluding that Vermillion has been reasonably diligent in developing its previously decreed conditional water storage right in those reservoirs.

## IV. Conclusion

¶ 72 In Case No. 08CW89, we vacate the portions of the water court's order interpreting the phrase "all other beneficial uses" in the 1974 change decrees regarding Raftopoulos's absolute rights in the Rouff Ditch No. 1 and Yarnell Ditch No. 1 and determining whether Raftopoulos had abandoned any right to use the decreed water for commercial or industrial purposes. Further, we reverse the portion of the water court's order decreeing Raftopoulos' requested new conditional water storage rights for the Elk Ranch Reservoir and the Elk Ranch Reservoir, Lower Site to the extent the decree permits the water to be used for industrial and commercial purposes.

¶ 73 In Case No. 06CW61, we reverse the water court's order granting Vermillion's request for a conditional water storage right for the Sparks Reservoir and the three alternate storage locations. In addition, in Case No. 08CW54, we reverse the water court's

order concluding that Vermillion has been reasonably diligent in developing its previously decreed conditional water storage right in those reservoirs.