496 P.3d 804
The PEOPLE of the State of Colorado, Petitioner
v.Levi Derek HALL, Respondent.
Supreme Court Case No. 20SC142 Supreme Court of Colorado.
October 18, 2021
As Modified on Denial of Rehearing November 1, 2021
Attorneys for Petitioner: Philip J. Weiser, Attorney General, Frank R. Lawson, Assistant Attorney General, Denver, Colorado
Attorneys for Respondent: Megan A. Ring, Public Defender, Chelsea E. Mowrer, Deputy Public Defender, Denver, Colorado
En Banc
JUSTICE BERKENKOTTER delivered the Opinion of the Court.
¶1 Can a trial court judge invite argument concerning properly admitted evidence before it renders a verdict in a bench trial? We answer this question in connection with our review of People v. Hall , No. 17CA0982, 2020 WL 435387 (Jan. 9, 2020), a split decision from a division of the court of appeals. There, the majority concluded that the trial court deprived the defendant, Levi Derek Hall, of his right to a fair trial because the trial court crossed the line from impartial judge to partisan advocate when it requested additional argument after closing arguments. We conclude that a trial court presiding over a bench trial acts within its discretion and does not abandon its role as a neutral arbiter when it asks both parties for additional argument about properly admitted evidence before rendering a verdict. Accordingly, we reverse the judgment of the division below and remand the case back to the division to consider Hall's claim regarding the trial court's proportionality review, which the division declined to address because it reversed his convictions.
I. Facts and Procedural History
¶2 Between April and July 2014, a man nicknamed the "Good Grammar Bandit" robbed seven banks. Each time, he wore large-framed sunglasses. In some of the robberies, the Good Grammar Bandit wore a dark blue jacket and a hat with ear flaps, while in others, he wore a hooded sweatshirt with the hood pulled over his head. Otherwise, his face was unobscured. He robbed each bank by handing the bank teller a note demanding cash and fleeing on foot after the teller complied.
¶3 Law enforcement officials, having no suspect, offered a $2,000 reward for information about the robberies. After seeing news reports about the robberies and the reward, J.B., Hall's ex-boyfriend, called the Crime Stoppers Hotline and identified Hall as the Good Grammar Bandit, stating that he recognized the perpetrator's physical characteristics, unusual hat, large-framed sunglasses, and dark blue jacket worn in the first four robberies.
¶4 The Good Grammar Bandit struck for the eighth time, on August 12, 2014, after J.B. had contacted authorities. Shortly thereafter, police began surveilling Hall, pulled him over for a traffic violation, and impounded his car because he was driving with a revoked license. The police subsequently performed an inventory search of the car and discovered large-framed sunglasses and $512 in cash. They arrested Hall and charged him with eight counts of robbery. He waived his right to a jury, and the case proceeded to a bench trial.
¶5 The key issue during trial was the identity of the robber. In support of its theory that Hall was the robber, the prosecution presented, as pertinent here, the following:
• J.B.'s testimony identifying Hall as the Good Grammar Bandit;
• bank employees' testimony about the robberies, including one employee who identified Hall as the robber;
• photo array lineups with ten bank employees in which three of the employees identified Hall as the robber, although only one with certainty; • multiple video clips and still-frame images captured by bank surveillance cameras showing the robber;
• evidence that Hall was pulled over for speeding near the location of the first robbery shortly before it occurred, including photographs and video taken of Hall during the stop;
• evidence that Hall was pulled over for speeding near the location of the second robbery shortly before it occurred, including photographs and video taken of Hall during the stop;
• evidence that the night before the sixth robbery, Hall stayed at a friend's house which was only a few minutes from the bank;
• evidence that Hall was either not working or was clocked-out at the time of all eight robberies; and
• the fact that after the police impounded Hall's car, they did not receive any further reports of robberies attributable to the Good Grammar Bandit.
¶6 Both photographs taken of Hall when he was pulled over for speeding show him wearing a large, diamond-like, studded earring in his left ear. The bank employees who witnessed the robberies testified that the robber wore a big hat or hood and that they could not see or remember anything conspicuous about his ears. The bank surveillance footage also seemed to corroborate their testimony, showing that the Good Grammar Bandit's ears were not visible during the robberies. Instead, the robber's ears appeared to be covered up either by the hood or ear flaps.
¶7 During closing argument, defense counsel argued, among other things, that Hall was not the same person as the robber shown in the bank surveillance videos. Specifically, Hall's counsel noted the differences between Hall's appearance in the speeding ticket photographs and the appearance of the robber in the surveillance footage, including the fact that there were no visible earrings in the bank footage.
¶8 During the prosecution's rebuttal closing argument, the trial court interjected and asked the prosecutor, "[In w]hich exhibits do we actually get to see the earrings ... during the robbery?" In response, the prosecutor explained:
We don't see earrings during the robbery. We see earrings in the traffic stop. ... You never see his ears in the robbery. That's done on purpose. Whether he's wearing an earring that day or not, we don't know, but you cover up as much as you can. You never see his ears. So the earring, I just don't believe [it has] any relevance because you can't see it in the robbery.
¶9 After the prosecutor concluded his rebuttal closing argument, the trial court immediately stated, "We are not done, folks. Cue up the videos of the stills." It then requested that the prosecution replay video from the first three robberies, including a frame-by-frame viewing of the footage from the third robbery. During this viewing, the trial court pointed out something no one else had noticed: light flashing or reflecting in the vicinity of the robber's ear. The trial court then engaged in the following exchange with the prosecutors and defense counsel:
THE COURT: What's in his ear? Play it through.
....
Right there. Anyone see a flash?
[PROSECUTOR]: Yes.
[SECOND PROSECUTOR]: Yes, sir.
THE COURT: That's what I wanted to see.
[PROSECUTOR]: Your Honor, does the Court want me to stop it?
THE COURT: No. Keep going.
....
See the flash again, folks? There was a flash that way too.
Okay. Turn the lights back on.
[Prosecutor], those two flashes that we saw, what's the government's —[to defense counsel] I'm going to let you talk too. Don't worry.
[DEFENSE COUNSEL]: I would object to the line of questioning. I would ask the Court to make the determination on its own without the input of the parties. THE COURT: No. It's argument at this point in time.
Okay. Those flashes in his ears, what do you think they are?
[PROSECUTOR]: I would argue that they are an earring.
THE COURT: [Defense counsel], what do you think they are, if anything?
[DEFENSE COUNSEL]: Your Honor, I don't feel comfortable answering that question.
THE COURT: Okay. That's fine.
... [D]o you want to make any additional argument?
[PROSECUTOR]: No, Judge.
THE COURT: Do you want to make any additional argument? Consult your client. I think he wants to talk to you.
¶10 The trial court subsequently made oral findings of fact and found Hall guilty of all eight counts of robbery. It also adjudicated Hall a habitual criminal and sentenced him to twenty-four years in the Department of Corrections.
¶11 Hall appealed, and a split division of the court of appeals reversed his convictions. The majority concluded that the trial court violated Hall's right to a fair trial when it asked the prosecutors whether they saw an earring in the surveillance footage. Hall , ¶ 20. Specifically, the majority held that by asking the question, the trial court crossed the line from neutral arbiter to advocate in three ways: (1) the prosecution had expressly declined to pursue that line of argument, and thus it was inappropriate for the trial court to raise it; (2) the form of the question treated the prosecutors like witnesses by asking for their personal opinions; and (3) the question was asked during deliberations because the prosecution had rested its case and closing arguments had concluded, which deprived defense counsel of a meaningful opportunity to respond. Id. at ¶¶ 20-21.
¶12 Justice Martinez, sitting by assignment,1 dissented. In his view, the trial court's request for both parties to present argument about admitted evidence did not constitute an abuse of discretion or an abandonment of the trial court's role as a neutral arbiter, id. at ¶ 28 (Martinez, J., dissenting), particularly in light of its "duty to see that the issues [were] not obscured and that the testimony [was] not misunderstood," id. at ¶ 26 (quoting United States v. Hickman, 592 F.2d 931, 933 (6th Cir. 1979) ). He also concluded that there was nothing inappropriate about the timing of the trial court's actions, noting that the judge gave defense counsel the same opportunity as the prosecutors to present argument about the flashes of light in the surveillance footage. Id. at ¶ 33.
¶13 The People petitioned for certiorari review, which we granted.2 II. Analysis
¶14 We begin by outlining the standard of review. Next, we detail the constitutional provisions that guarantee every criminal defendant the right to a fair trial and an impartial judge. We then explore the interplay between those constitutional protections, the wide discretion afforded to trial courts to conduct trials in an orderly way, and a trial court's duty to see that issues are not obscured and that justice is served.
¶15 After examining the trial court record and applying the law to the facts of this case, we conclude that the trial court did not violate its duty of impartiality by requesting additional argument from both the prosecution and the defense about the flashes of light it observed in the video surveillance footage. We also conclude that the division majority adopted an overly rigid and formalistic view of how deliberations must occur during a bench trial and that the trial court did not deprive defense counsel of a meaningful opportunity to respond to the court's request for additional argument. For these reasons, we conclude that the trial court did not violate Hall's right to a fair trial. Accordingly, we reverse the judgment of the division and remand with directions to reinstate Hall's judgment of conviction and sentence.
A. Standard of Review ¶16 "A trial court ... has wide discretion in conducting a trial," subject to its duty to maintain an impartial forum. People v. Coria, 937 P.2d 386, 391 (Colo. 1997). This includes discretion regarding the order and presentation of evidence, People v. Corbett, 199 Colo. 490, 611 P.2d 965, 968 (1980) ; see also CRE 611(a) ; the scope of the closing arguments, Coria, 937 P.2d at 391 ; whether to reopen the case to allow additional evidence, Plummer v. Struby-Estabrooke Mercantile Co., 23 Colo. 190, 47 P. 294, 295 (1896) ; and whether to directly question witnesses, People v. Ray, 640 P.2d 262, 264 (Colo. App. 1981). Thus, we review the trial court's actions for an abuse of discretion.3 Coria, 937 P.2d at 391. ¶17 A trial court abuses its discretion when it acts in a manner that is "manifestly arbitrary, unreasonable, or unfair." Dunlap v. People, 173 P.3d 1054, 1094 (Colo. 2007) (citing People v. Palomo, 31 P.3d 879, 882 (Colo. 2001) ). When defendants allege that a trial court is biased, they must demonstrate "more than mere speculation concerning the possibility of prejudice." Coria, 937 P.2d at 391. Instead, they must prove that "the trial judge's conduct so departed from the required impartiality as to deny the defendant[s] a fair trial." People v. Adler, 629 P.2d 569, 573 (Colo. 1981).
¶18 The division majority below appeared to apply either the plain error or constitutional harmless error standard of reversal. Hall, ¶¶ 10-11, 22 (majority opinion) (describing the two standards, evaluating the weight of the rest of the evidence against Hall, and determining that the "trial court relied heavily" on the flashes in the video). The majority did recognize that structural error analysis might apply but did not perform the analysis because neither party raised the issue until briefing before this court. Id. at ¶ 14 n.1. Because we perceive no abuse of discretion by the trial court, we need not reach this issue.
¶19 With these standards in mind, we turn to the applicable law.
B. Applicable Law ¶20 The Due Process clauses of the United States Constitution and the Colorado Constitution guarantee every criminal defendant the right to a fair trial. U.S. Const. amends. V, XIV ; Colo. Const. art. II, §§ 16, 25 ; Howard-Walker v. People , 2019 CO 69, ¶ 23, 443 P.3d 1007, 1011. This right includes the right to a trial before an impartial judge, People v. Hagos, 250 P.3d 596, 611 (Colo. App. 2009), and the right to an impartial finder of fact, Morrison v. People, 19 P.3d 668, 672 (Colo. 2000). During a bench trial, the trial judge assumes both of these roles. Citron v. Wachovia Mortg. Corp, 922 F. Supp. 2d 1309, 1314 (M.D. Fla. 2013). ¶21 This duty of impartiality requires not only that trial judges have no actual bias or personal interest in the litigation, Tumey v. Ohio, 273 U.S. 510, 535, 47 S.Ct. 437, 71 L.Ed. 749 (1927), but also that they refrain from taking on the role of an advocate during the course of the proceedings, People v. Martinez, 185 Colo. 187, 523 P.2d 120, 121 (1974). To this end, in our adversarial system of justice, we generally rely on the parties to frame the issues and the courts to serve as neutral arbiters. Galvan v. People, 2020 CO 82, ¶ 45, 476 P.3d 746, 757 (citing United States v. Sineneng-Smith, ––– U.S. ––––, 140 S. Ct. 1575, 1579, 206 L.Ed.2d 866 (2020) ). ¶22 Subject to this impartiality requirement, however, a trial court also has the duty to ensure that the facts are not obscured and to illuminate confusing issues. Hickman, 592 F.2d at 933. We expect judges to do more than simply resolve the disputes as presented to them by the parties without any regard to the veracity of the claims or fairness of the proceedings. See Quercia v. United States, 289 U.S. 466, 469, 53 S.Ct. 698, 77 L.Ed. 1321 (1933). Instead, judges have an affirmative duty to protect the integrity and impartiality of the court. Pena v. Dist. Ct., 681 P.2d 953, 956 (Colo. 1984) (stating that courts have the duty to fully exercise their powers, including those reasonably required to protect their independence and integrity); People v. Richardson, 2018 COA 120, ¶ 105, 486 P.3d 282, 302. ¶23 Furthermore, judges sitting as finders of fact in bench trials have the additional duty to assess the evidence and discover the truth, just as a jury would. Morris v. Belfor USA Grp., Inc., 201 P.3d 1253, 1258 (Colo. App. 2008). Pursuant to this obligation, a court presiding over a bench trial may ask questions it "deem[s] necessary to clearly bring out the facts so that the important functions of its office as trier of fact can be fairly and justly performed." People v. Casias, 43 Colo.App. 305, 603 P.2d 969, 970 (1979). ¶24 Further, we have held that trial courts are permitted to reopen cases and allow parties to admit additional evidence "whenever the ends of justice can be advanced thereby." Plummer , 47 P. at 295. We agree with the view expressed by the Pennsylvania Supreme Court that trial courts are also permitted to reopen cases and allow both parties to present additional argument, either following a party's motion or sua sponte, as long as "there is no prejudice to either party and, accordingly, justice is served." Commonwealth v. Safka, 636 Pa. 169, 141 A.3d 1239, 1251 (2016). And, if a trial court in its discretion can reopen a case in order to admit additional evidence, it stands to reason that the trial court should —if it so chooses —also be permitted to request argument about that new evidence, or previously admitted evidence, so long as it remains impartial. ¶25 Finally, we note that a trial court, especially when sitting as a factfinder, is not bound by the parties' arguments. In re Est. of Kiser, 72 P.3d 425, 431 (Colo. App. 2003). As a factfinder, it has the duty to evaluate the evidence independently and come to its own conclusions. Morris, 201 P.3d at 1258. In this role, the trial court may believe some or all or none of the evidence because, as the factfinder, the trial court's job is to discern the truth, even if the truth does not cleanly align with either party's version of the events. See id. ¶26 This discretion is, of course, limited by the constitutional command that judges must remain unbiased and that every defendant is guaranteed a fair trial. Coria, 937 P.2d at 391. Based on these considerations, we cannot say that a trial court abuses its discretion when it solicits argument concerning previously admitted evidence from both parties during a bench trial. Nor can we say that such behavior constitutes advocacy, thus depriving the defendant of a fair trial. ¶27 As we have stated previously, " [T]he rule against judicial participation must not be applied so rigidly as to interfere with the everyday operations of the courts." Crumb v. People, 230 P.3d 726, 731 (Colo. 2010). Ultimately, trial courts should retain discretion to oversee trials as they deem appropriate, subject to the constitutional limitations that they must remain neutral decisionmakers and must not infringe upon a defendant's right to a fair trial.
¶28 We now apply these principles to the case before us.
C. Application ¶29 We hold today that it is not an abuse of discretion for a trial court to invite argument from both parties regarding already-admitted evidence during a bench trial. And while we are cognizant of the fact that certain lines of questioning or comment may demonstrate that a court has stepped out of its role as a neutral arbiter and into the shoes of an advocate, we are not persuaded that is what occurred here. ¶30 That is, however, what happened in Martinez , when the trial court wholly abandoned its role as an impartial decisionmaker to advocate for the prosecution during a suppression hearing. 523 P.2d at 120. There, the court took the place of the district attorney after he failed to appear. Id. It called witnesses, presented evidence, and even objected to defense questioning before ruling on those same objections —all of which were the actions of an advocate, not an impartial judge. Id. at 120-21. We held that "this assumption of the role of advocate ... [was] inconsistent with the proper function of the judiciary and constitute[d] reversible error," noting that the judge's "active role in the presentation of the prosecution's case" was incompatible with due process. Id. at 121.
¶31 This case is easily distinguishable from Martinez . Here, the trial court was simply addressing the central factual issue before it —the true identity of the Good Grammar Bandit. Acting in its role as the finder of fact, the court asked to view properly admitted evidence a second time —a request well within its discretion — and gave both parties the opportunity to advance argument about their position on what the flashes of light were. We perceive no abuse of discretion or partiality here.
¶32 Moreover, while sitting as factfinder, the court had no obligation to agree with either the prosecution or the defense regarding what was depicted in the surveillance footage. It also had no obligation to inform the parties of its observations prior to making its findings of fact. Rather, it fulfilled its duty to carefully consider and independently evaluate the properly admitted evidence before it. In fact, this line of questioning gave defense counsel precisely what the division majority claims defense counsel was denied —a meaningful opportunity to respond. Instead of making a finding of fact that was contrary to both parties' positions without notifying either of the possibility, the court gave each party the opportunity to present additional argument. We do not believe that defense counsel was deprived of that opportunity merely because counsel declined the opportunity. ¶33 The division majority also concluded that the trial court should have raised this question when the surveillance footage was first admitted. Hall, ¶ 21. Again, we disagree. While it may be the better practice for a trial court to ask this type of question when the evidence at issue is first admitted, we do not believe that the court abused its discretion or denied the defendant a fair trial by waiting until after closing arguments. This is particularly true here because we do not know when the trial court first noticed the flashes of light. The court may have noticed the flashes when the surveillance video of the third robbery was first admitted, but it also may not have noticed them until sometime thereafter. ¶34 Nor are we concerned that the trial court improperly solicited the prosecution's personal opinion testimony. The prosecution may not express a personal opinion during trial. See Wilson v. People, 743 P.2d 415, 418 (Colo. 1987). It may, however, "draw reasonable inferences from the evidence." Id. ; see also Domingo-Gomez v. People, 125 P.3d 1043, 1051 (Colo. 2005) ("[C]ounsel may properly argue from reasonable inferences anchored in the facts in evidence ....").
¶35 It is apparent that the court's request was not an invitation for the prosecutors' personal opinions. Though it may have been poorly worded, we have previously held that the use of the word "think" does not magically transform appropriate questioning into a violation of the defendant's constitutional rights. See Simms v. People, 174 Colo. 85, 482 P.2d 974, 977 (1971) (approving a trial court's instruction that counsel should not offer personal opinions but could say "I think the evidence has clearly shown ..."). Here, the trial court's request was directed to both parties and was immediately preceded by the court saying, "It's argument at this point in time." The prosecutor did not opine on the credibility of a witness or appeal to emotional sentiments to compensate for conflicting or inconclusive evidence. Rather, the prosecution stated, "I would argue ..." in response to the trial court's request for argument regarding reasonable inferences that could be drawn from the flashes in the footage. This did not constitute an abuse of discretion. ¶36 We also agree with Justice Martinez's view that the majority erred in concluding that the timing of the trial court's question was inappropriate. To be sure, the bright line of demarcation between the evidentiary phase of a jury trial and deliberations serves a critical purpose. Jurors are instructed not to form any opinions about the case or determine guilt until after they start deliberating. See COLJI-Crim. C:10 (2020). The important concern underlying this instruction is that jurors may consider and weigh evidence prematurely without having heard the trial court's instructions, shift the burden of proof to the defendant, or remain tethered to an opinion formed prior to deliberation. People v. Flockhart, 2013 CO 42, ¶ 21, 304 P.3d 227, 233. In a bench trial, however, judges are not bound by the same instruction because "there is a presumption that all incompetent evidence is disregarded by the court in reaching its conclusions." Liggett v. People, 135 P.3d 725, 733 (Colo. 2006) (quoting People v. Fulton, 754 P.2d 398, 400 (Colo. App. 1987) ).
¶37 Because the exchange transpired during a bench trial, there was no risk of a jury prematurely forming a judgment without first hearing the court's instructions. Additionally, at the time of the exchange, there was no indication that the trial court had, in any manner, pre-judged the case. When the court rendered its verdict, it emphasized that it had its "own opportunity to independently look at each piece of evidence," including the still photographs and video. Accordingly, we disagree with the majority's conclusion that the trial court somehow interfered with its own deliberations.
¶38 Finally, we note that Hall, both in briefing before this court and the division below, argued that the trial court's actions violated his right to be presumed innocent and improperly shifted the burden of proof to him. The division majority disagreed with Hall, but he did not file a cross-petition for certiorari. The People, in their Reply Brief, did not contest that the issue presented in their petition for certiorari encompassed this issue. Assuming, without deciding, that the issue is properly before this court, we reject Hall's contention. We find no support for his assertion that asking the defense for argument during a bench trial concerning properly admitted evidence violates a defendant's right to be presumed innocent.
III. Conclusion
¶39 We hold that a trial court does not abuse its discretion when it requests additional argument from both parties regarding properly admitted evidence during a bench trial. Because the trial court did not assume the role of an advocate, it did not deprive Hall of a fair trial. Accordingly, we reverse the judgment of the division below and remand the case back to the division to consider Hall's claim regarding the trial court's proportionality review.
1 Retired Supreme Court Justice sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5 (3), and § 24-51-1105, C.R.S. (2020).
2 We granted certiorari to consider the following issue:
Whether, in a bench trial, the trial court reversibly erred when it solicited the parties' arguments on properly admitted evidence before the court announced its verdict.
3 Colorado case law variously characterizes this standard as either "abuse of discretion" or "gross abuse of discretion." This court has previously determined that these phrases have the same meaning. See Carrillo v. People, 974 P.2d 478, 485 (Colo. 1999) ("[W]e hold that the phrases ‘abuse of discretion,’ ‘clear abuse of discretion,’ and ‘gross abuse of discretion’ contained in our prior case law all have the same meaning.").