1
 2025 CO 33
Concerning the Application for Water Rights of Town of Firestone. Town of Firestone, Applicant-Appellant: v. BCL Colorado LP; City and County of Broomfield; City of Boulder; City of Englewood; City of Lafayette; City of Longmont; City of Westminster; Dream Weaver Holdings LLC; Godding Ditch Company; Last Chance Ditch Company; LG Everist, Inc.; Little Thompson Water District; New Coal Ridge Ditch Company; New Consolidated Lower Boulder Reservoir and Ditch Company; Public Service Company of Colorado; Rural Ditch Company; Shores On Plum Creek Metropolitan District No. 1; St. Vrain Left Hand Water Conservation District; St. Vrain Sanitation District; State Engineer and Water Division 1 Engineer; Town of Frederick; Varra Companies, Inc.; and Water Users Association of District No. 6. Opposers-Appellees: No. 24SA109
Supreme Court of Colorado, En Banc
May 27, 2025
 
           Appeal
 from the District Court District Court, Water Division 1,
 Case No. 19CW3236 Honorable Todd L. Taylor, Water Judge
 
 
          Orders
 Affirmed
 
 2
 
          
 Attorneys for Applicant-Appellant: Lawrence Custer Grasmick
 Jones & Donovan LLP Bradley C. Grasmick Wesley S. Knoll
 Richard LiPuma Jacklyn P. Gunn Johnstown, Colorado
 
 
          
 Attorneys for Opposer-Appellee St. Vrain Sanitation District:
 Lyons Gaddis, PC Matthew Machado Casey J. Weaver Louisville,
 Colorado
 
 
          
 Attorneys for Amicus Curiae Central Colorado Water
 Conservancy District: Lawrence Custer Grasmick Jones &
 Donovan LLP Bradley C. Grasmick David P. Jones Johnstown,
 Colorado
 
 
          
 Attorneys for Amicus Curiae East Cherry Creek Valley Water
 and Sanitation District: Nazarenus Stack & Wombacher LLC
 Brian M. Nazarenus Sheela S. Stack William D. Wombacher Stacy
 L. Brownhill Greenwood Village, Colorado
 
 3
 
           No
 appearance on behalf of: BCL Colorado LP; City and County of
 Broomfield; City of Boulder; City of Englewood; City of
 Lafayette; City of Longmont; City of Westminster; Dream
 Weaver Holdings LLC; Godding Ditch Company; Last Chance Ditch
 Company; LG Everist, Inc.; Little Thompson Water District;
 New Coal Ridge Ditch Company; New Consolidated Lower Boulder
 Reservoir and Ditch Company; Public Service Company of
 Colorado; Rural Ditch Company; Shores On Plum Creek
 Metropolitan District No. 1; St. Vrain Left Hand Water
 Conservation District; State Engineer and Water Division 1
 Engineer; Town of Frederick; Varra Companies, Inc.; and Water
 Users Association of District No. 6.
 
 
          
 Justice Berkenkotter delivered the Opinion of the Court, in
 which Chief Justice Márquez, Justice Hood, Justice
 Hart, and Justice Samour joined. Justice Gabriel, joined by
 Justice Boatright, dissented.
 
 
          
 OPINION
 
 
          
 BERKENKOTTER, JUSTICE
 
 4
 
          ¶1
 The Town of Firestone ("Firestone") challenges an
 order and decree of the District Court for Water Division 1
 ("the water court") that dismissed without
 prejudice three of five claims for groundwater well fields
 from Firestone's application for conditional groundwater
 rights and its accompanying augmentation plan.
 
 
          ¶2
 Firestone contends that the water court (1) misconstrued the
 contours of the "reasonably accurate" standard we
 previously articulated in City of Aurora ex rel. Util.
 Enter. v. Colo. State Eng'r, 105 P.3d 595, 615
 (Colo. 2005); (2) erred by declining to retain jurisdiction
 so Firestone could demonstrate non-injury at a later date;
 (3) erred by allowing the St. Vrain Sanitation District
 ("St. Vrain") to contest, contrary to a prior
 conditional stipulation, whether Firestone had met its burden
 of showing that the well fields would not cause injury; and
 (4) clearly erred in some of its material findings of
 fact.[1]
 
 5
 
          ¶3
 We conclude, consistent with our prior decisions, that a
 water court must evaluate an application for conditional
 groundwater rights and an accompanying augmentation plan on a
 case-by-case basis to determine whether the proposed water
 use would injure those with vested, senior water rights. If
 an applicant fails to meet its burden of showing that the
 proposed use would not cause injury, then a water court acts
 within its authority by rejecting the augmentation plan and
 dismissing the application for conditional groundwater rights
 based on the particular facts before it.
 
 
          ¶4
 We additionally conclude that the water court did not err in
 deciding that firestone failed to meet its burden of showing
 that its depletions in the well fields at issue would not
 injure those with vested, senior water rights in St. Vrain
 Creek. The water court also correctly declined to retain
 jurisdiction over Firestone's application because
 Firestone sought to delay its burden of demonstrating
 non-injury until after its conditional groundwater rights had
 been approved. And the water court likewise did not abuse its
 discretion, under the specific circumstances in this case,
 when it allowed an opposer to contest a conditional
 stipulation to a
 
 6
 
 question of law from a court filing. Lastly, it did not err
 by finding that Firestone's proposed well locations were
 not sufficiently specific to allow the town to calculate
 reasonably accurate estimates of lagged depletions.
 
 
          ¶5
 We therefore affirm the water court's order partially
 granting and partially denying St. Vrain's C.R.C.P.
 41(b)(1) motion to dismiss (the "2023 order") and
 its findings of fact, conclusions of law, and decree
 regarding Firestone's application (the "2024
 decree").
 
 
          I.
 Background
 
 
          ¶6
 We begin with an overview of the legal requirements at play
 to help contextualize the parties' dispute.
 
 
          A.
 Conditional Groundwater Rights and Augmentation
 Plans
 
 
          ¶7
 First, we review what a conditional water right is, how
 seeking such a right for groundwater in an over-appropriated
 basin requires an additional obligation called an
 augmentation plan, and the complex water engineering
 calculations that augmentation plans require to determine
 whether the proposed use of a conditional water right will
 result in injury to those with vested, senior water rights.
 "A classic form of injury involves diminution of the
 available water supply that a water rights holder would
 otherwise enjoy at the time and place and in the amount of
 demand for beneficial use under the holder's decreed
 water right
 
 7
 
 operating in priority." Farmers Reservoir &
 Irrigation Co. v. Consol. Mut. Water Co., 33 P.3d 799,
 807 (Colo. 2001).
 
 
          ¶8
 A conditional water right is "a right to perfect a water
 right with a certain priority upon the completion with
 reasonable diligence of the appropriation upon which such
 water right is to be based." § 37-92-103(6), C.R.S.
 (2024). A conditional water right "preserves an
 applicant's position in the priority system while the
 applicant takes the necessary steps (such as obtaining
 financing, complying with regulatory and access requirements,
 and completing engineering, etc.) to put the appropriated
 water to beneficial use." Vermillion Ranch Ltd.
 P'ship v. Raftopoulos Bros., 2013 CO 41, ¶ 32,
 307 P.3d 1056, 1064.
 
 
          ¶9
 A conditional right to groundwater, where an applicant is
 seeking to pump water from multiple tributary well fields
 that have a hydrologic connection to a surface stream, is
 more complicated than a conditional surface water right. To
 establish such a conditional groundwater right in an
 over-appropriated basin like the South Platte River basin
 where this dispute arose, an applicant must also submit an
 augmentation plan with sufficient detail to demonstrate
 non-injury to those with vested, senior water rights. See
 Buffalo Park Dev. Co. v. Mountain Mut. Reservoir Co.,
 195 P.3d 674, 684 (Colo. 2008).
 
 
          ¶10
 The General Assembly created augmentation plans "in
 order to allow continuance of existing uses and to assure
 maximum beneficial utilization of the
 
 8
 
 waters of this state." § 37-92-501.5, C.R.S.
 (2024). "When unappropriated water is unavailable,
 augmentation plans permit junior water right holders to
 divert water out-of-priority while ensuring the protection of
 senior water rights." Farmers Reservoir &
 Irrigation Co., 33 P.3d at 806. Augmentation plans
 "operate[] to replace depletions (often from well
 pumping) with substitute water supply in an amount necessary
 to prevent injury to other water rights," including
 delayed depletions caused by well pumping. Centennial
 Water & Sanitation Dist. v. City & Cnty. of
 Broomfield, 256 P.3d 677, 684 (Colo. 2011).
 
 
          ¶11
 A water court evaluates out-of-priority depletions for
 non-injury based on many interrelated factors, including but
 not limited to "the timing and location of depletions as
 well as the availability of replacement water." City
 of Aurora, 105 P.3d at 615. Depletions to the surface
 stream happen because "withdrawal of tributary ground
 water through a well results in either decreased aquifer
 discharge to surface water or increased loss from surface
 water." Luke W. Harris & Christopher J. Sanchez,
 Considerations for Analyzing Colorado Ground Water: A
 Technical Perspective, 15 U. Denv. Water L. Rev. 105,
 117 (2011). These depletions are also referred to as
 "lagged depletions" because there is a timing lag
 between the well pumping and the subsequent effect on the
 surface water stream. Id. Depending on local
 conditions, lagged depletions can take anywhere from days to
 years to fully impact local surface water. Id.
 
 9
 
          ¶12
 In order for water engineers to properly account for these
 lagged depletions in an augmentation plan, they often rely on
 computational models that use unit response functions
 ("URFs") to quantify the timing and amount of
 depletions on a surface stream from nearby groundwater
 pumping by a well.
 
 
          ¶13
 If an applicant for a new conditional groundwater right fails
 to meet their burden of showing non-injury, including by
 submitting inaccurate or insufficient lagged depletion
 calculations in their augmentation plan, then a water court
 is obligated to dismiss the application. See Buffalo
 Park, 195 P.3d at 685.
 
 
          B.
 Retained Jurisdiction
 
 
          ¶14
 Because augmentation plans only permit out-of-priority
 groundwater pumping subject to the condition that such
 pumping does not injure those with vested, senior water
 rights, the General Assembly also created a statutory
 retained jurisdiction period that a water court must invoke
 when a decree permitting an augmentation plan has been
 entered to ensure continued compliance with the non-injury
 requirement. See Upper Eagle Reg'l Water Auth. v.
 Wolfe, 230 P.3d 1203, 1211-12 (Colo. 2010). This
 statutory mechanism allows a water court to maintain
 supervisory jurisdiction over a water matter to monitor
 whether "vested water rights and conditionally decreed
 water rights may not be sufficiently protected against injury
 under provisions of the existing decree" in light of
 "real life operational experience." Id. at
 1215.
 
 10
 
          ¶15
 Section 37-92-304(6), C.R.S. (2024), provides that
 "[a]ny decision of the water judge . . . dealing with .
 . . a plan for augmentation . . . shall be subject to
 reconsideration by the water judge on the question of injury
 to the vested rights of others." We have previously held
 that an initial non-injury determination is a condition
 precedent that must be satisfied before the water
 court may reconsider an additional or changed injury through
 the mechanism of retained jurisdiction. In City of
 Aurora, for instance, we held that "the purpose of
 retained jurisdiction is to address injurious effects that
 result from the operation of a decreed augmentation plan, and
 may only be invoked by Opposers after a finding of
 non-injury by a water court." 105 P.3d at 616 (emphasis
 added).
 
 
          ¶16
 We reiterated this reasoning in Buffalo Park, when
 we held that the "[i]ntroduction of reliable evidence of
 the quantity, time, and location of depletions and the legal
 availability of replacement water is the responsibility of
 the applicant and cannot be postponed to occur under retained
 jurisdiction." 195 P.3d at 685. And we did so as well in
 Upper Eagle, when we observed that section
 37-92-304(6) "plainly demonstrates the General
 Assembly's intent that the retained jurisdiction period
 function to allow reconsideration of injury
 determinations the water court previously
 made." 230 P.3d at 1212 (emphases added).
 
 
          ¶17
 With this background in mind, we now turn to the specifics of
 this case.
 
 11
 
          II.
 Facts and Procedural History
 
 
          ¶18
 To get oriented, we begin by describing how the parties ended
 up in water court. We then review the C.R.C.P. 41(b)(1)
 motion that led the water court to ultimately (1) dismiss
 without prejudice a portion of Firestone's application
 for conditional groundwater rights and (2) revise its
 accompanying augmentation plan accordingly.
 
 
          ¶19
 Firestone is a statutory town of approximately 16,000 people
 located in southwestern Weld County, Colorado. In response to
 population growth within its boundaries—which it
 expects to double by 2050—Firestone has embarked on a
 public works project to expand its water portfolio, including
 the construction of a new reverse osmosis water treatment
 plant. All told, Firestone issued roughly $55 million worth
 of water enterprise revenue bonds to finance the project. To
 effectuate part of its planned water system expansion,
 Firestone filed an application for water rights in the water
 court in December 2019, which it amended in March 2020, that
 sought to (1) change existing water rights; (2) appropriate
 new conditional surface water and groundwater rights,
 including storage rights; and (3) compensate for proposed
 out-of-priority usage via rights of exchange and an
 augmentation plan.
 
 
          ¶20
 As part of its application, Firestone sought conditional
 groundwater rights to, and augmentation of, five wells or
 well fields, which it referred to as:
 
 12
 
 • the Mountain Shadows Well
 
 
 • the FAST[2] Well Field
 
 
 • the FAST North Well Field
 
 
 • the Firestone Trail Well Field
 
 
 • the St. Vrain Sanitation District Well Field
 
 
          ¶21
 Because these proposed wells would withdraw water out of
 priority and cause depletions to the nearby St. Vrain Creek,
 Firestone was also required to file an augmentation plan to
 prevent injury to those with vested, senior water rights.
 
 
          ¶22
 Whether these wells satisfied the legal conditions necessary
 to establish a conditional groundwater right was the subject
 of a three-day trial in the water court. While twenty-four
 potentially impacted water rights holders initially entered
 appearances as opposers in the water case, all but one
 entered stipulations with Firestone prior to trial. St.
 Vrain, on whose land one of Firestone's proposed well
 sites would be located, remained the sole active opposer when
 the case went to trial.[3] St. Vrain is a wastewater service
 provider that serves more than 15,000 residential and
 business accounts in and around the Firestone area.
 
 
          ¶23
 Firestone described the location of the five wells or well
 fields as follows:
 
 13
 
 • The Mountain Shadows Well: in the N.W. 1/4 of the SE
 1/4 of Section 1, Township 2 North, Range 68 West of the 6th
 P.M., Weld County, Colorado.
 
 
 • The FAST Well Field: in the SW 1/4 of the SW 1/4 of
 Section 31, Township 3 North, Range 67 West of the 6th P.M.,
 Weld County, Colorado.
 
 
 • The FAST North Well Field: in the NE 1/4 of the SW 1/4
 of Section 31, Township 3 North, Range 67 West of the 6th
 P.M., Weld County, Colorado.
 
 
 • The Firestone Trail Well Field: in the N.W. 1/4 of the
 N.W. 1/4 of Section 5, Township 2 North, Range 67 West of the
 6th P.M., Weld County, Colorado.
 
 
 • The St. Vrain Sanitation District Well Field: in the
 N.W. 1/4 of the SE 1/4 and the SW 1/4 of the NE 1/4 of
 Section 31, Township 3 North, Range 67 West of the 6th P.M.,
 Weld County, Colorado.
 
 
          Notably,
 these are all descriptions of quarter-quarter sections (i.e.,
 forty-acre tracts) of land or, in the case of the St. Vrain
 Sanitation District Well Field, two adjacent quarter-quarter
 sections (i.e., an eighty-acre tract) of land.
 
 
          ¶24
 During trial, Firestone presented evidence in its
 case-in-chief regarding the location and function of the
 wells or well fields for which it was seeking conditional
 groundwater rights. It also offered evidence of the lagged
 depletion calculations that it made in connection with its
 augmentation plan.
 
 
          ¶25
 Firestone did not provide specific well locations or
 well-specific URFs for the FAST North Well Field, the
 Firestone Trail Well Field, or the St. Vrain Sanitation
 District Well Field (the "Subject Well Fields").
 Instead, because the
 
 14
 
 exact number and location of wells were still being refined,
 Firestone proposed invoking the water court's retained
 jurisdiction to later provide more specific well locations
 and updated URFs tied to the Subject Well Fields.
 Firestone's plan to invoke the court's retained
 jurisdiction in this manner was contained within paragraph 48
 of its proposed decree ("Paragraph 48").
 
 
          ¶26
 St. Vrain focused on this lack of geographic specificity when
 it cross-examined several of Firestone's expert
 witnesses, prompting concessions from those witnesses
 regarding several key issues. Specifically, St. Vrain's
 questioning elicited testimony that (1) the Subject Well
 Fields' locations were less definite than some of the
 testimony on direct examination had suggested, (2) this lack
 of precision made its URF calculations less reliable, and (3)
 Firestone planned to rely on the water court's retained
 jurisdiction to provide more specific well locations and URFs
 at a later date. After Firestone closed its case-in-chief,
 the water court granted St. Vrain's request to continue
 the trial to allow St. Vrain to file a written motion to
 dismiss pursuant to C.R.C.P. 41(b)(1).
 
 
          ¶27
 Shortly thereafter, St. Vrain filed its written motion to
 dismiss, arguing that firestone had failed to meet its burden
 of proof as to its conditional groundwater rights claims. St.
 Vrain's objections boiled down to two main arguments: (1)
 Firestone failed to provide reasonably accurate well
 locations, making its URF calculations inherently inaccurate;
 and (2) Firestone improperly sought to rely on
 
 15
 
 the water court's retained jurisdiction to try to prove
 non-injury at a later date, after the conditional groundwater
 rights and corresponding augmentation plan were decreed.
 Firestone's plan to use the water court's retained
 jurisdiction in this manner, St. Vrain argued, was legally
 impermissible. Moreover, it would lower Firestone's
 burden of proof with respect to its conditional groundwater
 rights application by delaying the water court's
 necessary non-injury finding until after a
 conditional groundwater right was granted.
 
 
          ¶28
 Firestone countered that St. Vrain was demanding it provide
 "exact precision" in its proposed well locations,
 which the town asserted is at odds with this court's
 "reasonably accurate" standard articulated in
 City of Aurora. In an over-appropriated watershed
 like the South Platte River basin, Firestone argued, such a
 strict requirement would effectively mean that no party could
 receive a conditional groundwater right until the drilling of
 a well was imminent or actually completed, making it
 "virtually impossible for municipalities and other water
 users to plan for growth" or to develop future water
 resources to support that anticipated growth. In support of
 its argument, Firestone noted that quarter-quarter section
 descriptions were used by other, prior applicants and
 approved in prior water court orders and, regardless, that it
 had demonstrated sufficient replacement water supplies to
 account for depletions above and beyond what its models
 projected to be necessary.
 
 16
 
          ¶29
 In reply, St. Vrain noted that lagged depletions for
 conditional groundwater rights are determined by the location
 of a well, and not by a centroid of a quarter-quarter
 section.[4] Pointing to the trial testimony, St. Vrain
 emphasized that Firestone's experts conceded that they
 didn't know if some of the wells would be drilled
 vertically or horizontally and that even minor differences in
 distance between proposed and actual well sites could result
 in significantly altered depletion patterns. Because of this,
 St. Vrain argued that Firestone's URFs did not meet the
 "reasonably accurate" standard.
 
 
          ¶30
 The water court ultimately entered the 2023 order partially
 granting and partially denying St. Vrain's Rule 41(b)(1)
 motion to dismiss. It denied the motion to dismiss as to the
 FAST Well Field and the Mountain Shadows Well. However, it
 concluded that the URFs for the Subject Well Fields, which
 were calculated based on estimated,
 potential well locations, were insufficient to
 establish that Firestone's depletions would not injure
 those with vested, senior water rights. The water court found
 that Firestone's URFs for the three Subject Well Fields
 did not accurately capture lagged depletions because the
 calculations were not based on a complete picture of the
 actual or planned location of the wells in the Subject Well
 
 17
 
 Fields. Without this information, the court concluded,
 Firestone could not reliably determine the timing and amount
 of those lagged depletions.
 
 
          ¶31
 The water court further noted that the standard practice in
 cases adjudicating augmentation plans is to calculate a URF
 at a specific well location to reliably determine the timing
 and amount of lagged depletions based on that well's
 location. The water court described Firestone's use of
 representative estimated locations for the three Subject Well
 Fields as a "novel" approach that deviated from
 this standard practice. The water court also expressed
 concern that well construction decisions that had yet to be
 made by Firestone—including whether the wells would be
 vertical or horizontal, their distance from St. Vrain Creek,
 and their location relative to gravel pits on the proposed
 well field properties—would all impact the actual URFs.
 Finally, the water court gave weight to Firestone's own
 expert conceding that inaccurate URF calculations could
 result in underestimated lagged depletions, which could
 ultimately cause injury to those with vested, senior water
 rights. Taken together, the water court ultimately found that
 all these factors combined to make the URFs unreliable for
 the contested Subject Well Fields. It therefore determined
 that Firestone did not meet its burden to show non-injury.
 
 
          ¶32
 The water court additionally reasoned that it would be
 inappropriate to retain jurisdiction because it was unable to
 reach the issue of non-injury—which,
 
 18
 
 it explained, is a requirement before a water court may
 retain jurisdiction over an application. For these reasons,
 it granted St. Vrain's motion to dismiss Firestone's
 application for conditional groundwater rights for the
 Subject Well Fields and the corresponding sections of
 Firestone's proposed augmentation plan.
 
 
          ¶33
 Following its 2023 order, the water court entered the 2024
 decree that articulated its findings of fact and conclusions
 of law. The 2024 decree indicates that the court dismissed
 Firestone's claims for conditional groundwater rights for
 the Subject Well Fields without prejudice pursuant to its
 2023 order. It additionally removed those well fields from
 the plan for augmentation.
 
 
          ¶34
 Firestone appeals both the 2023 order and the 2024 decree.
 Firestone now asks us to review the water court's
 decisions, arguing that the water court (1) misconstrued the
 contours of the "reasonably accurate" standard we
 previously articulated in City of Aurora, (2) erred
 by declining to retain jurisdiction so Firestone could
 demonstrate non-injury at a later date, (3) erred by allowing
 St. Vrain to contest the Subject Well Fields after
 conditionally stipulating in a prior filing that those wells
 were uncontested, and (4) clearly erred in some of its
 material findings of fact.
 
 
          III.
 Application
 
 
          ¶35
 We turn to the standard of review before applying the law to
 the facts before us.
 
 19
 
          A.
 Standard of Review
 
 
          ¶36
 We have direct appellate review jurisdiction over water
 adjudications pursuant to article VI, section 2(2) of the
 Colorado Constitution; section 13-4-102(1)(d), C.R.S. (2024);
 and C.A.R. 1(a)(2), 1(e), and 4(a).
 
 
          ¶37
 We review a water court's conclusions of law de novo.
 Franktown Citizens Coal. II, Inc. v. Indep. Water &
 Sanitation Dist., 2025 CO 5M, ¶ 30, P.3d . In
 contrast, "[w]e accept the water court's factual
 findings on appeal unless they are so clearly erroneous as to
 find no support in the record." Burlington Ditch
 Reservoir & Land Co. v. Metro Wastewater Reclamation
 Dist., 256 P.3d 645, 660 (Colo. 2011). "Where there
 are two permissible views of the evidence, the
 factfinder's choice between them cannot be clearly
 erroneous." Anderson v. City of Bessemer City,
 470 U.S. 564, 574 (1985).
 
 
          ¶38
 "Whether to give effect to or repudiate . . . a
 stipulation rests with the sound discretion of the trial
 court." Lake Meredith Reservoir Co. v. Amity Mut.
 Irrigation Co., 698 P.2d 1340, 1346 (Colo. 1985). Thus,
 an appellate court reviews a water court's decision to
 disregard a stipulation for an abuse of discretion.
 Id. A water court "does not abuse its
 discretion unless its ruling is manifestly arbitrary,
 unreasonable, or unfair." Front Range Res., LLC v.
 Colo. Ground Water Comm'n, 2018 CO 25, ¶ 15,
 415 P.3d 807, 810 (quoting Murray v. Just In Case Bus.
 Lighthouse, LLC, 2016 CO 47M, ¶ 32, 374 P.3d 443,
 453).
 
 20
 
          B.
 Applications for Conditional Groundwater Rights Are Evaluated
 on a Fact-Specific, Case-By-Case Basis
 
 
          ¶39
 Firestone argues that the water court created a new
 bright-line test for conditional groundwater rights that
 requires an applicant to complete the construction of a well
 before obtaining a conditional groundwater right. Its framing
 of the issue stems in part from a line in the water
 court's 2023 order that reads, "[b]ecause water
 rights are decreed to structures and points of diversion, it
 follows that the point of diversion for conditional
 groundwater rights is a completed well—not the well
 field where that well may be located." (Citation
 omitted.)
 
 
          ¶40
 But Firestone ignores the rest of the story. In the very next
 line in its order, the water court explained: "As a
 general proposition, the court accepts Firestone's
 argument that an application for a conditional water right
 can identify a proposed structure using a quarter-quarter
 section legal description."
 
 
          ¶41
 The water court elaborated, noting that this court "has
 looked to both context and case-specific facts when
 approaching the question [of] whether an applicant must
 identify an exact location for a diversion structure to
 obtain a conditional water right." Discussing our
 reasoning in City & County of Denver ex rel. Board of
 Water Commissioners v. Colorado River Water Conservation
 District, 696 P.2d 730, 747 n.13 (Colo. 1985), it
 observed that such determinations "must always be made
 on an ad hoc basis, taking into account whether the
 particular
 
 21
 
 facts of each case satisfy the purposes underlying the
 requirements of the first step test [as to intent and overt
 acts towards an appropriation]." (Alteration in the 2023
 order.) The water court also analyzed our holding in City
 of Thornton v. Bijou Irrigation Co., 926 P.2d 1, 34
 (Colo. 1996), in which we noted that "notice does not
 require an applicant to determine the exact amount of water
 to be diverted at a precisely located point of
 diversion." Applying the logic behind those cases, as
 well as City & County of Denver's
 instruction that a water court must look to the particular
 facts of a case when making a determination on a conditional
 water right application, the water court concluded that
 "a quarter-quarter description of the general location
 of a structure may be acceptable in certain contexts, while
 the exact location of the diversion may be required in other
 contexts."
 
 
          ¶42
 The water court then considered the cases that Firestone
 cited in which quarter-quarter descriptions were deemed
 sufficiently specific for a water court to make a finding of
 non-injury. The court was unpersuaded. Two of the cases did
 not involve conditional water rights and two involved
 conditional storage rather than conditional groundwater
 rights. In three of the four cases, structures or points of
 diversion already existed, and the fourth concerned
 evaporative losses from a storage pond. The water court found
 them easily distinguishable.
 
 
          ¶43
 Turning to the merits with respect to the Subject Well
 Fields, the water court determined that "Firestone seeks
 court-approval here of (1) an unspecified
 
 22
 
 number of diversions with (2) those points of diversion
 located anywhere in a [forty]-acre parcel." It went on
 to conclude that it was "not persuaded that Firestone
 can properly obtain conditional groundwater rights for an
 undeveloped [forty]-acre (or [eighty]-acre) parcel."
 
 
          ¶44
 In reaching this conclusion, the water court explained that
 conditional groundwater rights are different from conditional
 surface water rights in that they must be accompanied by an
 augmentation plan when their operation could injure those
 with vested, senior water rights. City of Aurora,
 105 P.3d at 617 (holding that "a conditional right to
 pump water that would injure senior appropriators may only be
 decreed in conjunction with an augmentation plan").
 
 
          ¶45
 Ultimately, the water court found that it could not make the
 necessary non-injury determination with respect to the
 Subject Well Fields based on the evidence presented by
 Firestone at trial. And because it could not conclusively
 make a non-injury finding, it could not approve the relevant
 portion of the augmentation plan. Without the augmentation
 plan, it could not approve the conditional groundwater rights
 for the Subject Well Fields, which is why the water court
 dismissed those claims without prejudice. But in so doing,
 the water court did not hold that an applicant must complete
 the construction of a well before obtaining a conditional
 groundwater right. Rather, the water court correctly
 recognized that it must
 
 23
 
 evaluate the evidence before it on a case-by-case basis to
 determine if the applicant met its burden to prove
 non-injury.
 
 
          ¶46
 Firestone next contends that a conditional groundwater right
 does not need to be precisely described but must instead
 merely put other water right owners on notice of the scope of
 the withdrawal from the water source. See City of
 Thornton, 926 P.2d at 24-25. Firestone asserts that the
 water court held it to an impossible standard, one that
 required it to precisely identify the future location of the
 wells it planned to develop in the Subject Well Fields. This
 proves, Firestone claims, that the water court adopted and
 applied a "precisely accurate" standard rather than
 the "reasonably accurate" standard articulated in
 City of Aurora.
 
 
          ¶47
 As we have explained, "in reviewing a proposed
 augmentation plan, a water court must consider the amount and
 timing of the applicant's depletions, the amount and
 timing of available replacement water, and the existence of
 injury to senior appropriators." City of
 Aurora, 105 P.3d at 615. "Thus, before an applicant
 can establish an absence of injury to satisfy its prima facie
 case, it must first establish the timing and location of
 depletions, as well as the availability of replacement water
 to prevent injury from those depletions." Id.
 (holding that a water court erred in determining the absence
 of injury where it failed to consider the relationship
 between the amount and timing of depletions and the amount
 and timing of replacement water). "Whether an
 augmentation plan will result in
 
 24
 
 material injury to senior appropriators is a factual
 determination based on the evidence presented in a particular
 case." Id.
 
 
          ¶48
 Here, the water court correctly applied City of
 Aurora and Buffalo Park in requiring Firestone
 to demonstrate that its augmentation plan would replace all
 out-of-priority depletions in the proper time, place, and
 amount to prevent injury. By reaffirming this principle, we
 do not create a new bright-line rule; rather, we affirm the
 water court's judgment that each non-injury evaluation
 performed when considering an augmentation plan that
 accompanies a conditional groundwater right application must
 be evaluated on a fact-specific, case-by-case basis. That is
 precisely what the water court did here.
 
 
          C.
 The Water Court Did Not Err by Refusing to Retain
 Jurisdiction Prior to Making a Finding of Non-Injury
 
 
          ¶49
 During trial, Firestone acknowledged some degree of
 uncertainty in its planning for the Subject Well Fields. This
 is why it urged the water court to adopt an augmentation plan
 that would authorize Firestone to later add specific well
 locations to the plan and then update the actual URF
 calculations for each of the Subject Well Fields. That is,
 Firestone proposed to use the water court's retained
 jurisdiction as a means to allow it to more specifically and
 accurately calculate injury down the road. Firestone's
 proposed decree included this plan in Paragraph 48 as a
 workaround to address this uncertainty.
 
 25
 
          1.
 Paragraph 48
 
 
          ¶50
 Paragraph 48 of Firestone's proposed decree provided, in
 relevant part, that its URFs "may be updated as needed
 if the URFs of the Augmented Wells change (once completed) or
 if additional Augmented Wells are included in the
 augmentation plan decreed herein." It further outlined a
 process by which it would notify all objectors of the
 proposed change, give them sixty-three days to comment or
 object, and seek approval from the Division Engineer.
 
 
          ¶51
 In its 2023 order, the water court rejected this proposal as
 an impermissible use of retained jurisdiction. As a result,
 it subsequently struck the bulk of Paragraph 48 from the 2024
 decree. Firestone contends that the water court's
 decision was in error because Firestone's proposed
 "test period" for the operation of its conditional
 groundwater rights within the augmentation plan would
 necessarily be subject to review and possible refinement when
 the town later applied to make those conditional groundwater
 rights absolute. We disagree.
 
 
          2.
 An Applicant Must Show Non-Injury When It Applies for a
 Conditional Groundwater Right
 
 
          ¶52
 As we explained in Buffalo Park, the
 "[i]ntroduction of reliable evidence of the quantity,
 time, and location of depletions and the legal availability
 of replacement water is the responsibility of the applicant
 and cannot be postponed to occur under retained
 jurisdiction." 195 P.3d at 685 (citing City of
 Aurora, 105 P.3d at 616-17). Indeed, our case law is
 clear that an applicant must meet its
 
 26
 
 burden at the time that it applies for a conditional
 groundwater right. But Firestone did not meet this
 burden. Consequently, Paragraph 48 would improperly allow it
 to postpone its burden to demonstrate the time and amount of
 depletions until after the entry of the decree.
 See City of Aurora, 105 P.3d at 616. Instead,
 "the purpose of retained jurisdiction is to
 reconsider injury once an augmentation plan is
 operating, not to prove depletions or prove injury for the
 first time." Id. (emphasis added). Here, it
 would have been improper for the water court to exercise
 retained jurisdiction in the manner Firestone proposed since
 it was unable to make a threshold finding of non-injury.
 
 
          ¶53
 Because retained jurisdiction is proper only after an initial
 showing of non-injury is made, the water court did not err
 when it declined to approve Paragraph 48, which would have
 allowed Firestone to improperly delay meeting its burden to
 prove non-injury as to the three Subject Well Fields.
 
 
          D.
 The Water Court Did Not Abuse Its Discretion by Allowing St.
 Vrain to Contest Non-Injury Following a Conditional Rule 11
 Stipulation
 
 
          ¶54
 Pursuant to Rule 11(b)(6)(B) of the water court rules,
 counsel for the parties submitted a joint statement of
 disputed issues to the court prior to trial. See
 Rule 11(b)(6)(B), Uniform Local Rules for All State Water
 Court Divisions. The statement also included a list of
 undisputed issues. That list provided, among other things,
 that "[t]he proposed URF depletion patterns for the FAST
 Well Field,
 
 27
 
 Firestone Trail Well Field, and FAST North Well Field are
 adequate to prevent injury." The joint statement also
 provided that:
 
 
 The inclusion of issues or opinions on this list is not
 intended to constitute a waiver of any objection that the
 parties may have to the admission of evidence or expert
 opinion testimony, including, without limitation, relevance
 objections and qualifications of the experts. All such
 objections are reserved for trial. The statements of issues
 that are anticipated to be the subject of expert testimony at
 trial are based upon the parties' current understanding
 of the case and the information presented to date.
 
 
          ¶55
 St. Vrain later indicated in its trial brief that it intended
 to raise issues as to all five wells—including the well
 fields that were initially listed as undisputed in the
 parties' joint statement—and to challenge Paragraph
 48 and Firestone's plan to rely on the exercise of the
 court's retained jurisdiction to update its well
 locations and URFs.
 
 
          ¶56
 Firestone objected, asserting that St. Vrain's
 backtracking would result in Firestone being unprepared to
 address issues it considered resolved based on the joint
 statement. Firestone argued that allowing parties to
 disregard partial settlements made under Rule 11(b)(6) would
 run afoul of the goals and intent of the water court rules.
 
 
          ¶57
 Later, during a discussion of preliminary matters before the
 first day of trial, St. Vrain argued that it was not
 backtracking on the joint statement because the summary of
 disputed issues was conditional. It specifically pointed to
 the language that "[t]he statements of issues that are
 anticipated to be the subject of
 
 28
 
 expert testimony at trial are based upon the parties'
 current understanding of the case and the information
 presented to date."
 
 
          ¶58
 St. Vrain additionally noted that it identified the
 specificity of the well fields and the usage of Paragraph 48
 as contested in its statement of opposition, in its expert
 disclosures, and in the parties' proposed trial
 management order.
 
 
          ¶59
 The water court indicated that it would "hold both
 parties to the undisputed matters of fact and expert opinion
 in the [Trial Management Order]," and that, "to the
 extent that issues are raised that contradict the undisputed
 matters of fact, I'm likely not going to allow a party to
 contradict those at this point." However, the water
 court deferred ruling on the matter while noting that
 "[t]o the extent that these matters are outside the
 undisputed matters of fact or there's a relevance issue,
 it seems to me that St. Vrain has the right to raise that
 issue." The water court ultimately allowed St. Vrain to
 challenge Firestone's witnesses on cross-examination
 regarding Firestone's well locations and the town's
 URF depletion patterns for all five well fields over
 Firestone's objections.
 
 
          ¶60
 Firestone asserts that the court erred by disregarding the
 parties' stipulation and allowing St. Vrain to
 "change its mind." We are not persuaded.
 
 
          ¶61
 We review a trial court's decision to disregard a
 stipulation for an abuse of discretion. Lake Meredith
 Reservoir Co., 698 P.2d at 1346. It is within a
 water court's discretion to give effect to or repudiate a
 stipulation. Id.
 
 29
 
          ¶62
 So, did the water court abuse its discretion when it allowed
 St. Vrain to contest the sufficiency of Firestone's
 non-injury analysis for its well fields at trial?
 
 
          ¶63
 Based on the record before us, we conclude that the water
 court did not abuse its discretion. To be sure, stipulations
 under Rule 11 play an important role in water law cases. But
 here, the water court reasonably determined that the joint
 statement of disputed issues contained a clause that reserved
 to any party—including St. Vrain—the right to
 change its mind.
 
 
          ¶64
 Moreover, St. Vrain made clear in its statement of
 opposition, expert disclosures, and the proposed trial
 management order that it intended to challenge
 Firestone's evidence regarding the URFs for all five
 wells and well fields as to the issue of non-injury. St.
 Vrain was the only party that did not enter into a settlement
 with Firestone; instead, it proceeded to trial because of its
 concerns with the exact issues that are before us today.
 
 
          ¶65
 Lastly, and most importantly, parties may not stipulate a
 question of law. Bar 70 Enters., Inc. v. Tosco
 Corp., 703 P.2d 1297, 1306 (Colo. 1985) ("A
 stipulation cannot be used to bind a court in the
 determination of questions of law or mixed questions of law
 and fact."). The injury inquiry in an augmentation plan
 is a question of law. Buffalo Park, 195 P.3d at 690.
 Because the water court had a duty to determine the issue of
 non-injury in this case, if it was not persuaded by the
 
 30
 
 evidentiary record before it, then it was not obligated to
 accept the terms of the parties' initial stipulation as
 true.
 
 
          ¶66
 For these reasons, we hold that the water court did not abuse
 its discretion when it allowed St. Vrain to contest the issue
 of non-injury at trial.
 
 
          E.
 The Water Court's Findings of Fact Were Not Clearly
 Erroneous
 
 
          ¶67
 During a bench trial, a trial judge assumes the role of both
 an impartial judge and an impartial finder of fact.
 People v. Hall, 2021 CO 71M, ¶ 20, 496 P.3d
 804, 810. "[J]udges sitting as finders of fact in bench
 trials have the additional duty to assess the evidence and
 discover the truth, just as a jury would." Id.
 at ¶ 23, 496 P.3d at 811. A trial court serving as
 fact-finder "may believe some or all or none of the
 evidence because, as the factfinder, the trial court's
 job is to discern the truth, even if the truth does not
 cleanly align with either party's version of the
 events." Id. at ¶ 25, 496 P.3d at 811.
 "We accept the water court's factual findings on
 appeal unless they are so clearly erroneous as to find no
 support in the record." Burlington Ditch, 256
 P.3d at 660.
 
 
          ¶68
 Because Firestone argues that the water court's 2023
 order and 2024 decree were clearly erroneous, we examine the
 evidence offered at trial to determine if the water
 court's rulings had support in the record. The below
 material captures some—but by no means all—of the
 evidence St. Vrain elicited. From this evidence, we conclude
 that the water court's rulings had sufficient support in
 the record.
 
 31
 
          1.
 Relevant Trial Testimony
 
 
          ¶69
 Witness David Brian Lindsay is a civil engineering consultant
 for Firestone whose work focuses on water infrastructure,
 design construction, and operations. He previously worked as
 the town's engineer for twenty-four years. He testified
 on direct that there was some uncertainty regarding the well
 locations:
 
 
 Mr. Knoll: And why did you pick to describe them as
 "wellfields"?
 
 
 Mr. Lindsay: So again, this was one of the lessons that we
 learned. It was—we were fortunate that the case had
 not—the original application had been submitted because
 a lot of this information was really being developed, I mean,
 literally as—as you guys were getting ready to submit
 this application . . . . . . . .
 
 
 . . . [T]hat's why we started to identify these as
 fields, because we didn't know exactly what kind of a
 well configuration we would want to put on it. And even if it
 was going to be vertical wells, it would probably have to be
 multiple wells to be able to get the capacity out that we
 wanted.
 
 32
 
          Mr.
 Lindsay went on to explain that the pumping rates and output
 of the well fields were an "assumption" based on
 data from other well sites, and not necessarily from
 site-specific test wells.
 
 
          ¶70
 On cross-examination, St. Vrain's attorney asked Mr.
 Lindsay if Firestone knew how many wells it would construct
 on the FAST North Well Field:
 
 
 Mr. Machado: [H]ow many wells would be constructed on that
 property, Mr. Lindsay?
 
 
 Mr. Lindsay: I don't know. We didn't go to the next
 stage of evaluation and design on that field.
 
 
          ¶71
 Mr. Machado also asked Mr. Lindsay about the location of
 wells on the Firestone Trail Well Field during his
 cross-examination:
 
 
 Mr. Machado: Do you know how many well—how many wells
 the Town plans to construct on that—
 
 
 Mr. Lindsay: No. Again—
 
 
 Mr. Machado: —wellfield?
 
 
 Mr. Lindsay: —we have not gone to that level of design
 yet.
 
 
          ¶72
 And, regarding the location of any wells on St. Vrain's
 property, Mr. Lindsay testified that, while he believed the
 most probable outcome was that Firestone would construct a
 horizontal well approximately 250 feet from St. Vrain Creek,
 he acknowledged that there was uncertainty as to the final
 plan.
 
 33
 
 Mr. Knoll: So the planned development of [the St. Vrain
 Sanitation District Well Field] would be a horizontal well
 parallel to the river channel?
 
 
 Mr. Lindsay: We don't know that for a fact. It would be
 in that corridor. It could be a vertical well. It could be a
 series of vertical wells. It could be a horizontal well. It
 could be a combination of those. . . . .
 
 
 . . . The expectation was, candidly, that, yes, it would be a
 horizontal well, but we didn't—we wouldn't know
 that for sure until we were able to get in and do that final
 testing.
 
 
          ¶73
 Later, during St. Vrain's cross-examination of Andrew
 Case, an engineer and project manager who assisted Firestone
 in developing its water planning project, Mr. Case
 acknowledged that URFs can vary within a single
 quarter-quarter section.
 
 
          ¶74
 At the conclusion of Mr. Case's testimony, the water
 court asked him a number of questions regarding the accuracy
 of the URF depletion patterns and how the Paragraph 48
 mechanism would function if Firestone later determined,
 
 34
 
 upon siting the groundwater wells, that the URFs needed to be
 modified to more accurately capture the correct lagged
 depletion patterns.[5]
 
 
 The Court: Does it matter how many wells are drilled in a
 particular quarter section—quarter-quarter section;
 does that affect the analysis of the lagged depletions?
 
 
 Mr. Case: It would affect how we locate the centroid. . . .
 
 
 The Court: I guess my question is, does it affect the rate of
 depletion? Do three wells or four wells cause the same rate
 of depletion as one well? Or does the fact that there are now
 multiple wells in a quarter-quarter section either speed up
 or slow down the depletions?
 
 
 Mr. Case: So whether or not they're interfering with one
 other?
 
 
 The Court: Right.
 
 
 Mr. Case: I mean, physically, that can happen, and . . .
 that, I think, would be true for—for any of these
 wellfields.
 
 35
 
 Again, I think [another expert] could probably testify to
 whether or not the Glover method[6] accounts for that. I'm
 not sure.
 
 
 The Court: All right. And what's your understanding of
 the proposed decree; how does it account for that variation,
 if it does at all?
 
 
 Mr. Case: The proposed decree would rely upon the URFs . . .
 or if—subject to that Paragraph 48, if they're
 further refined.
 
 
 And the total well pumping from that wellfield would be used
 to calculate the depletion by that URF.
 
 
          ¶75
 Jacob Paul Bauer, a hydrogeologist who was retained by
 Firestone, testified that moving a well closer or further
 from the river even a short distance can make a difference in
 the URF calculation. He explained on cross-examination that
 moving a well site 150 feet could result in a nine-fold
 increase in the amount of calculated depletions accruing to
 the stream for one day. Local conditions matter
 
 36
 
 too, such as whether an unlined gravel pit is present at the
 site. These are inputs that can cause changes to the URF
 calculation. "[W]hat I've learned is that it's
 hard to go strictly on intuition on those things, that you
 can be surprised by the math of the Glover equation and how
 the boundaries are incorporated, and it depends very
 specifically on what site you're talking about," Mr.
 Bauer said.
 
 
          ¶76
 Mr. Bauer also stated during cross-examination, when
 questioned about prior applications that involved wells with
 lagged depletions, that the well locations in those cases
 were described more precisely either by Universal Transverse
 Mercator coordinates or distances from section lines. Upon
 further questioning, Mr. Bauer replied that he had never been
 involved in an application that contained a mechanism like
 Paragraph 48 "[b]ecause the cases that we just talked
 about, the structures exist or they have a defined location
 that's more—more known than it is known in this
 case."
 
 
          ¶77
 Firestone even acknowledged in its briefing to this court
 that "there is some validity to the concern that a URF
 may not be representative of the ultimate demand on the water
 supply if the final location of the diversion at the time a
 groundwater right is made absolute is significantly different
 than what was modeled." However, Firestone's
 proposed remedy to this issue is the use of retained
 jurisdiction. As we discussed above, the use of retained
 jurisdiction when a water court cannot first determine
 non-injury is not supported by the law.
 
 37
 
          2.
 The Trial Record Supports the Water Court's Evidentiary
 Findings
 
 
          ¶78
 As noted, a trial court serving as fact-finder may believe
 some or all or none of the evidence because, as the
 fact-finder, the trial court's job is to discern the
 truth, even if the truth does not cleanly align with either
 party's version of the events. Hall, ¶ 25,
 496 P.3d at 811. We disturb those findings of fact only if
 they have no support in the record. Burlington
 Ditch, 256 P.3d at 660.
 
 
          ¶79
 The testimony by Firestone's expert witnesses as to the
 uncertainty regarding the locations of the wells within the
 Subject Well Fields—and the resulting uncertainty about
 Firestone's ability to accurately calculate lagged
 depletions for those well fields—supports the water
 court's ultimate conclusion that Firestone failed to meet
 its burden of demonstrating non-injury as to those well
 fields. Notably, Firestone's experts conceded that, if
 the URFs are incorrect, then the accounting would at times
 underestimate lagged depletions, resulting in insufficient
 replacement of the lagged depletions, which in turn would
 injure those with vested, senior water rights.
 
 
          ¶80
 While the evidence at trial on the issue of non-injury was
 disputed, to be sure, we cannot say on this record that there
 was no evidence to support the water court's findings.
 Far from being clearly erroneous, the water court had a solid
 evidentiary foundation for its order partially granting St.
 Vrain's motion to dismiss.
 
 38
 
          IV.
 Conclusion
 
 
          ¶81
 For the foregoing reasons, we affirm the water court's
 2023 order and 2024 decree.
 
 
          
 JUSTICE GABRIEL, joined by JUSTICE BOATRIGHT, dissented.
 
 39
 
          
 JUSTICE GABRIEL, joined by JUSTICE BOATRIGHT, dissenting.
 
 
          ¶82
 The majority affirms the water court's judgment,
 concluding, among other things, that the water court's
 evidentiary findings (presumably including its findings that
 the Town of Firestone did not know the locations, number, or
 types of wells it proposed to build) were sufficiently
 supported by the record. Maj. op. ¶¶ 68-80.
 Because, in my view, many of the water court's findings
 were unsupported by the record, and because I believe that
 the water court applied an overly strict interpretation of
 the reasonable accuracy standard that applies to augmentation
 plan applications, I would reverse the water court's
 judgment and remand for further findings. Accordingly, I
 respectfully dissent.
 
 
          I.
 Facts and Procedural History
 
 
          ¶83
 The majority sufficiently sets forth the underlying facts,
 and I need not repeat that factual recitation here.
 Accordingly, I note only the facts necessary to my analysis.
 
 
          ¶84
 The water court here rejected Firestone's conditional
 water rights application, concluding that (1) the approval of
 such an application required that Firestone also obtain
 approval of an augmentation plan, which obligated Firestone
 to establish a prima facie case that its proposed depletions
 would be non-injurious; and (2) Firestone had not met this
 initial burden. In support of this ruling, the water court
 first found that Firestone had not provided specific location
 
 40
 
 information for any proposed well in the FAST North,
 Firestone Trail, and St. Vrain Sanitation District Well
 Fields and further did not specify how many wells would be
 completed in those fields or whether the wells would be
 vertical or horizontal. Next, the water court observed that
 the depletion factor, or unit response function
 ("URF"), for a well "must be based on its
 exact location" and must account for the distance from
 any relevant hydrological conditions in the area. Because
 Firestone could not specify the "exact locations"
 of any wells that it might complete in the FAST North,
 Firestone Trail, and St. Vrain Sanitation District Well
 Fields, the court concluded that Firestone had not carried
 its initial burden of showing that its proposed augmentation
 plan would prevent injury to senior appropriators. The court
 thus denied without prejudice Firestone's application as
 to those three well fields.
 
 
          II.
 Analysis
 
 
          ¶85
 I begin by discussing the applicable law. I then apply the
 law to the facts before us.
 
 
          A.
 Applicable Law
 
 
          ¶86
 We must accept the water court's factual findings unless
 they are so clearly erroneous as to have no support in the
 record, but we review de novo the court's conclusions of
 law. Dill v. Yamasaki Ring, LLC, 2019 CO 14, ¶
 23, 435 P.3d 1067, 1074.
 
 41
 
          ¶87
 A conditional water right is "a right to perfect a water
 right with a certain priority upon the completion with
 reasonable diligence of the appropriation upon which such
 water right is to be based." § 37-92-103(6), C.R.S.
 (2024). An applicant may not obtain a conditional right to
 divert water that would injure senior appropriators, however,
 except in conjunction with an augmentation plan assuring
 sufficient available water to exercise that right. Fox v.
 Div. Eng'r for Water Div. 5, 810 P.2d 644,
 645 (Colo. 1991).
 
 
          ¶88
 An augmentation plan applicant bears the initial burden of
 producing sufficient evidence to establish a prima facie case
 that its proposed depletions will not cause injury to
 existing water rights. City of Aurora ex rel. Util.
 Enter. v. Colo. State Eng'r, 105 P.3d 595,
 614 (Colo. 2005). If the applicant satisfies this burden,
 then the burden shifts to opposers to present evidence of
 injury. Id. If opposers present such evidence, then
 the applicant has the ultimate burden of showing, by a
 preponderance of the evidence, an absence of injurious
 effect. Id. at 614-15.
 
 
          ¶89
 Section 37-92-305(8)(a), C.R.S. (2024), delineates factors
 that a referee or water judge must consider when reviewing a
 proposed augmentation plan. That statute provides, in
 pertinent part:
 
 
 [T]he referee or the water judge shall consider the
 depletions from an applicant's use or proposed use of
 water, in quantity and in time, the amount and timing of
 augmentation water that would be provided by the applicant,
 and the existence, if any, of injury to any owner of or
 persons entitled to use water under a vested water right or a
 decreed conditional water right.
 
 42
 
 Id.
 
 
          ¶90
 Under this standard, the applicant must present
 "reliable evidence of the quantity, time, and location
 of depletions and the legal availability of replacement
 water." Buffalo Park Dev. Co. v. Mountain Mut.
 Reservoir Co., 195 P.3d 674, 685 (Colo. 2008). This
 evidence must be sufficient to permit the water court to make
 a "reasonably accurate" determination. City of
 Aurora, 105 P.3d at 616-17.
 
 
          ¶91
 As the foregoing makes clear, the water court must consider
 depletions from an applicant's use or proposed use of
 water in both quantity and time to determine whether injury
 will result, and not as an end in itself. Upper Eagle
 Reg'l Water Auth. v. Simpson, 167 P.3d 729,
 735 (Colo. 2007). The statute thus requires an
 "integrated inquiry" into whether the proposed
 augmentation plan, if approved, would cause injury to vested
 rights, and only if operation of the plan would do so does
 the statute require the water court to deny the application.
 Id. As a result, consideration of the use or
 proposed use of water in both quantity and time is not an
 "independent query that can defeat the proposed
 augmentation plan," but rather this assessment serves as
 an aid in making the injury determination. Id.
 
 
          ¶92
 Augmentation adjudications necessarily require predictions of
 future injury, and thus, they involve "an inherent
 amount of uncertainty." Id. at 736.
 Accordingly, we have previously recognized that
 "uncertainties are not fatal to a plan for
 augmentation." Id. Rather, as discussed above,
 the applicant must
 
 43
 
 present evidence to permit only a "reasonably
 accurate" determination. City of Aurora, 105
 P.3d at 616-17.
 
 
          B.
 Application
 
 
          ¶93
 In light of the foregoing legal principles, I believe that
 the water court below erred in two ways. First, in my view,
 the court's factual findings that Firestone did not know
 where its proposed wells would be located, how many wells it
 would construct, or what kind they would be were, in large
 part, unsupported by the record and, to that extent, were
 clearly erroneous. Second, I believe that the water court
 proceeded to assess its foregoing findings based on an overly
 strict reading of the applicable legal standard. I address
 these issues in turn.
 
 
          1.
 Clearly Erroneous Factual Findings
 
 
          ¶94
 With respect to its factual findings, as noted above, the
 water court found that Firestone had not shown the locations,
 number, or types of its proposed wells. The record, however,
 largely does not support this determination.
 
 
          ¶95
 Specifically, Firestone presented approximate proposed well
 locations for each of the well fields not yet developed,
 namely, the FAST North Well Field, the Firestone Trail Well
 Field, and the St. Vrain Sanitation District Well Field. In
 particular, through its civil engineering consultant, David
 Lindsay, Firestone introduced into evidence a map marked as
 Exhibit 50, which is reproduced below.
 
 44
 
          (Image
 Omitted)
 
 
          ¶96
 This map contained a number of stars that Lindsay testified
 represented the approximate locations where Firestone
 intended to place wells (the "Varra Well Field"
 denoted on the map is another name for the FAST North Well
 Field). Another of Firestone's experts, Jacob Bauer, then
 explained that he calculated the URF for each of these well
 locations.
 
 
          ¶97
 Firestone further specified the distance from the St. Vrain
 Creek for each of its proposed well fields, further
 demonstrating the location of its proposed wells.
 Specifically, Lindsay testified that Firestone proposed to
 develop the FAST North
 
 45
 
 Well Field at a point approximately 100 feet from the Creek,
 and he explained why the conditions in that area allow for
 such close proximity to the Creek. Lindsay further testified
 that Firestone proposed to develop the Firestone Trail Well
 Field approximately 4,101 feet from the Creek on a small
 parcel of land already owned by Firestone, and Lindsay
 described the rationale for developing a well field on
 Firestone's own property. And Lindsay testified that
 Firestone intended to develop the St. Vrain Sanitation
 District Well Field approximately 250 feet from the Creek.
 Specifically, he explained that, subject to final testing,
 Firestone expected to construct one horizontal well that
 would run parallel to the Creek at this distance and would
 stretch from 500 to 1,500 feet in length. Accordingly,
 contrary to the water court's finding that Firestone
 provided no specific locations for its proposed wells,
 Firestone introduced detailed evidence showing the wells'
 proposed locations.
 
 
          ¶98
 Similarly, notwithstanding the water court's finding to
 the contrary, Firestone also presented evidence of the types
 of wells that it intended to build in each well field. In
 particular, Lindsay testified that constraints in the areas
 of the FAST North and Firestone Trail Well Fields would
 almost certainly mandate the construction of only vertical
 wells in those well fields. In addition, as described above,
 Firestone expected to build a horizontal well in the St.
 Vrain Sanitation District Well Field. In explaining
 Firestone's proposed plans, Lindsay candidly
 
 46
 
 acknowledged that conditions could ultimately show that
 Firestone might instead have to construct vertical wells in
 this well field, but Lindsay noted that, regardless of type,
 the well or wells would be located a similar distance from
 the Creek.
 
 
          ¶99
 Lastly, regarding the number of wells, Lindsay testified that
 Firestone intended to develop one well in the St. Vrain
 Sanitation District Well Field. He acknowledged, however,
 that Firestone had not yet determined how many vertical wells
 it would ultimately develop in the FAST North and Firestone
 Trail Well Fields.
 
 
          ¶100
 In light of the foregoing, although the water court's
 finding that Firestone did not yet know how many wells it
 intended to develop in the FAST North and Firestone Trail
 Well Fields had record support, the court's findings that
 Firestone did not know the locations of its proposed wells,
 the types of wells to be constructed, or the number of wells
 to be constructed in the St. Vrain Sanitation District Well
 Field were contrary to the record and, thus, were clearly
 erroneous.
 
 
          ¶101
 In reaching this conclusion, I am not persuaded otherwise by
 the majority's conclusion that some evidence in the
 record supported the water court's findings. Maj. op.
 ¶¶ 68-80. Although the majority points to testimony
 from Firestone's experts indicating some uncertainty, as
 noted above, such uncertainty is inherent in an augmentation
 adjudication and is not fatal to a proposed augmentation
 plan. Upper Eagle, 167 P.3d at 736. Nor does a lack
 of certainty alter the fact that
 
 47
 
 Firestone introduced evidence showing the proposed locations
 of its wells, the proposed types of wells, and, as to the St.
 Vrain Sanitation District Well Field, the proposed number of
 wells.
 
 
          ¶102
 For this reason alone, I do not believe that the water
 court's judgment can stand. But, in my view, this is not
 the sole reason that the judgment below should be reversed.
 
 
          2.
 Errors of Law
 
 
          ¶103
 Compounding what I believe to be the clearly erroneous
 factual findings described above, I believe the water court
 assessed its factual determinations under an overly strict
 reading of the governing legal principles. Specifically, the
 court repeatedly said that it needed to know the "exact
 locations" of the wells before determining whether
 Firestone had established a prima facie case of non-injury.
 The law, however, does not require this level of precision.
 
 
          ¶104
 As discussed above, in City of Aurora, 105 P.3d at
 616-17, we explained that an augmentation plan applicant need
 only present sufficient evidence to allow the water court to
 make a "reasonably accurate" determination. Such a
 requirement recognizes the inherent uncertainties of
 augmentation plan applications. See Upper Eagle, 167
 P.3d at 736.
 
 
          ¶105
 Accordingly, the water court's requirement that Firestone
 establish the "exact locations" of its proposed
 wells was inconsistent with both the standard
 
 48
 
 that we set forth in City of Aurora, 105 P.3d at
 616-17, and the uncertainty that our opinion in Upper
 Eagle, 167 P.3d at 736, recognized inheres in
 augmentation plan applications.
 
 
          ¶106
 In addition, as we observed in Upper Eagle, 167 P.3d
 at 735, the determination of the time, amount, and location
 of depletions does not occur in a vacuum or act as "an
 independent query that can defeat the proposed augmentation
 plan." Rather, the water court must perform an
 "integrated inquiry" into whether the plan would
 cause injury to vested rights, and only if the plan would
 cause such injury does the statute require the water court to
 deny the application. Id. Here, the water
 court's apparent requirement of near-certainty was
 contrary to the requirement of an integrated inquiry into
 injury and instead echoed the kind of determination of the
 time, amount, and location of depletions for its own sake
 that we rejected in Upper Eagle, 167 P.3d at 735.
 
 
          ¶107
 I am not persuaded otherwise by the water court's view
 that, on the facts of this case, it needed to know the
 "exact locations" of the proposed wells in order to
 reach the question of injury.
 
 
          ¶108
 Another of Firestone's experts, Andrew Case, testified
 that a well located 250 feet from the St. Vrain Creek would
 "essentially have the same URF" over the entire
 quarter-quarter, or forty-acre, section. And here, as noted
 above, the evidence showed that (1) Firestone sought to
 construct the St. Vrain Sanitation
 
 49
 
 District Well Field 250 feet from the Creek and (2) even if
 it had to construct vertical wells instead of the proposed
 horizontal well in that well field, the wells would still be
 located approximately 250 feet from the Creek. Thus, any
 variation in the exact locations of those proposed wells (or
 even in the type of wells to be constructed) would have had
 no material impact on the URFs that the water court required
 to make an injury determination.
 
 
          ¶109
 Case further explained that, in the well fields in which
 Firestone planned to construct multiple wells, it could
 configure them in such a way as to minimize their
 interference with each other and thus any change in the rate
 of depletion caused by a change in the number of wells.
 (Although the majority emphasizes Case's testimony that
 the wells could interfere with one another, it omits from its
 quotation of his testimony his explanation that Firestone
 could space the wells to minimize this interference. Maj. op.
 ¶ 74.)
 
 
          ¶110
 In my view, the foregoing evidence established that the
 limited uncertainty involved in Firestone's application
 did not preclude an assessment of injury. Nor did it provide
 any reason to depart from the well-established standard of
 reasonable accuracy that we set forth in City of
 Aurora, 105 P.3d at 616-17.
 
 
          ¶111
 Accordingly, I believe that the water court applied an
 incorrect and overly strict legal standard in determining
 whether Firestone had established a prima
 
 50
 
 facie case of non-injury to support its proposed augmentation
 plan, and for this reason as well, I do not believe that its
 judgment can stand.
 
 
          III.
 Conclusion
 
 
          ¶112
 Because I believe that the water court's judgment
 dismissing Firestone's application for conditional water
 rights as to the FAST North, Firestone Trail, and St. Vrain
 Sanitation District Well Fields was based, in large part, on
 clearly erroneous factual determinations and on an overly
 strict reading of the applicable legal standard, I would
 reverse the water court's judgment and remand this case
 to allow the court to apply the appropriate legal standard to
 the facts properly established in the record.
 
 
          ¶113
 In light of the foregoing, I need not reach the other issues
 that Firestone raises in this appeal.
 
 
          ¶114
 For these reasons, I respectfully dissent.
 
 
 ---------
 
 
 Notes:
 
 
 [1] Specifically, Firestone presented the
 following four issues on appeal:
 
 
 1. Whether an applicant must complete the construction
 of a well prior to obtaining a conditional groundwater
 right.
 
 
 2. Whether the water court erroneously refused to
 retain jurisdiction over the augmentation plan to further
 evaluate determinations of non-injury after operation of the
 augmentation plan.
 
 
 3. Whether the water court erroneously allowed an
 opposer to contest issues at trial after stipulating in
 writing that those issues were undisputed.
 
 
 4. Whether certain material findings of fact were
 clearly erroneous.
 
 
 [2] FAST stands for Firestone Alluvial
 Supply and Treatment, an acronym that Firestone uses within
 the context of its water supply planning.
 
 
 [3] "Any person or organization may
 maintain a statement of opposition for the purpose of holding
 the applicant for a conditional water right to a standard of
 strict proof." Buffalo Park, 195 P.3d at
 686.
 
 
 [4] During trial, Firestone witness Andrew
 Case defined a centroid as "one point that can be
 considered representative of a larger area."
 
 
 [5] "[A] court presiding over a bench
 trial may ask questions it 'deem[s] necessary to clearly
 bring out the facts so that the important functions of its
 office as trier of fact can be fairly and justly
 performed.'" Hall, ¶ 23, 496 P.3d at
 811 (alteration in original) (quoting People v.
 Casias, 603 P.2d 969, 970 (Colo.App. 1979)).
 
 
 [6] The Glover equation is a mathematical
 formula that provides an estimate of the amount, location,
 and timing of stream depletions after accounting for various
 factors including soil transmissivity, aquifer thickness, and
 distance from the well to the stream. See Harris
 & Sanchez, supra, at 128; see also
 Leonard Rice & Michael D. White, Engineering Aspects
 of Water Law 127 (1991).
 
 
 ---------